**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

PAUL L. BROWNING,                              )
                                               )
          Petitioner,                          )          3:05-cv-0087-RCJ-WGC
                                               )
vs.                                            )          **ORDER**
                                               )
RENEE BAKER, *et al.*,                         )
                                               )
          Respondents.                         )
                                               )
_____/

Introduction

      This action is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by

Paul L. Browning, a Nevada prisoner sentenced to death.  The case is before the court for resolution

of the merits of the claims remaining in Browning's fifth amended petition for a writ of habeas

corpus.  The court will deny Browning's petition.  The court will grant Browning a certificate of

appealability with respect to certain of his claims.

Background Facts and Procedural History

      In its June 10, 2004, decision on the appeal in Browning's state habeas corpus action,

the Nevada Supreme Court described, as follows, the factual background of the case, as revealed by

the evidence at trial:

On November 8, 1985, Hugo Elsen was stabbed to death during a robbery of his jewelry store in Las Vegas.  His wife, Josy Elsen, was in the back of the store when he was attacked.  Hearing noises, she went into the showroom and saw a black man wearing a blue cap squatting over her husband holding a knife.  She fled out the back door to the neighboring store and asked the employees there to call the police.  She and a neighboring employee, Debra Coe, then returned to the jewelry store where Coe placed a pillow under Elsen's head and covered him with a blanket.  Two to four minutes later help arrived.  Elsen soon died, after giving a very brief description of the perpetrator as a black man wearing a blue cap with loose curled wet hair.  Debra Coe also described a man she had seen leaving the vicinity: he was wearing a blue cap, blue jacket, Levi's, and tennis shoes; was about 27 years old and about six-feet tall; and had hair a little longer than the cap he was wearing and a mustache.  Another witness, Charles Woods, identified a person he saw leaving the vicinity as a black man wearing a dark or blue cap and dark trousers, about six-feet tall, and weighing about 180 pounds.

Shortly after the crimes, Randy Wolfe approached police and told them that a man was in Wolfe's nearby hotel room with a large amount of jewelry.  The police went to the room and found Browning with the jewelry.  Browning was arrested and taken to Coe and Woods for a showup identification.  They identified Browning as the man they saw leaving the vicinity of the crimes.

At trial, Vanessa Wolfe, Randy Wolfe's wife, testified for the State to the following.  She returned to her hotel room on the day of the crimes and found Browning taking off his clothes.  He had a coat, which was either on the floor or on the bed.  On the bed was a lot of jewelry with tags, which she helped cut off.  Browning asked Vanessa to help him get rid of some of the jewelry and said he thought he had just killed somebody.  She helped Browning by throwing the tags and his hat in a nearby dumpster.  Browning gave her a knife to dispose of.  Instead, she put the knife in a pizza box in a closet under the stairs.  The officers assigned to Browning's case testified that they retrieved all of this evidence from the places that Vanessa described.  Randy Wolfe also testified that when he went into his hotel room, Browning was sitting on the bed and said that he just robbed a jewelry store and thought that he had killed a man.  Investigators found Browning's fingerprints in the jewelry store.

Browning was convicted, pursuant to a jury trial, of first-degree murder with the use of a deadly weapon, robbery with the use of a deadly weapon, burglary, and escape.  At the penalty hearing, the State presented detailed evidence of his prior felonies for robbery with the use of a knife.  Browning's mother testified as a mitigating witness.  She stated that Browning attended private school as a child, was a very good student and president of the student council, and was very athletically inclined, winning medals in cross-country.  She had marital problems, and she and Browning moved to Washington, D.C., where he worked as a doorman for the United States Congress and took paralegal classes at the Library of Congress.  After Browning left high school, she had not had much contact with him, but she knew that he was very remorseful for the crimes.  Browning spoke in allocution and stated that his involvement with drugs was the reason he was implicated in the crimes.  He apologized for the pain that the Elsen and Browning families had suffered.  He stated that he did not want to die and that he was innocent.

2

1         The jury found five aggravating circumstances: the murder was committed
2   while Browning was engaged in a burglary; the murder was committed while he was
    engaged in a robbery; he was previously convicted of a felony involving the use or
3   threat of violence; the murder was committed while he was under a sentence of
    imprisonment; and the murder involved depravity of mind.  The jury did not find any
    mitigating circumstances and returned a sentence of death.
4

5   *Browning v. State*, 120 Nev. 347, 352-53, 91 P.3d 39, 43-44 (2004).

6         Browning appealed, and, on June 24, 1988, the Nevada Supreme Court affirmed.  *Browning*

7   *v. State,* 104 Nev. 269, 757 P.2d 351 (1988) (a copy of the opinion is in the record at Exhibit 91

8   (ECF No. 59-65, pp. 2-8)).[1] [2]

9         On May 17, 1989, Browning filed, in the state district court, a petition for post-conviction

10  relief.  Exhibit 105 (ECF Nos. 59-68, 59-69, 59-70).  The state district court held an evidentiary

11  hearing.  Exhibits 161, 179-83 (ECF Nos. 59-102, 59-103, 59-128 - 59-150).  Browning's petition

12  was denied.  Exhibits 208, 230 (ECF Nos. 59-167, pp. 18-19, and 59-171).

13        Browning appealed, and, on June 10, 2004, the Nevada Supreme Court affirmed in part,

14  vacated in part, and remanded the case to the state district court for further proceedings.  *Browning*

15  *v. State*, 120 Nev. 347, 91 P.3d 39 (2004) (copy in record at Exhibit 264 (ECF No. 59-184,

16  pp. 18-51)).  The court ruled that Browning's appellate counsel had been ineffective for failing to

17  challenge the "depravity of mind" aggravating circumstance, and, therefore, vacated Browning's

18  death sentence and remanded the case for a new penalty hearing.  *Id*.

19        On the remand from the Nevada Supreme Court, Browning's new penalty hearing was

20  conducted, before a jury, from April 10 through 14, 2006.  Exhibits 335-45 (ECF Nos.

21  59-195 - 59-201).  The jury returned a verdict imposing the sentence of death, and a judgment

22

23  _____

24     [1]  The exhibits referred to in this order by number only, as "Exhibit 1," "Exhibit 2," etc., were
    filed by respondents, and are found in the record at ECF Nos. 59 and 119.

25     [2]  Within ECF, with respect to documents filed during the early stages of this case (*e.g.* ECF
26  No. 59), there is a discrepancy between the document numbers shown on the docket and the document
    numbers shown on the tops of the documents themselves.  In this order, in such cases, the court refers
    to the document numbers that appear on the tops of the documents themselves.

imposing the death sentence was entered on August 22, 2006.  Exhibit 343 (ECF No. 59-201, p. 34) (verdict); Exhibit 360 (ECF No. 59-205, pp. 45-47) (judgment).

Browning appealed, and on July 24, 2008, the Nevada Supreme Court affirmed.  *Browning v. State*, 124 Nev. 517, 188 P.3d 60 (2008) (copy in record at Exhibit 384 (ECF No. 119-3, pp. 4-37)).

On February 10, 2005, Browning initiated this federal habeas corpus action.  The court appointed the Federal Public Defender (FPD) to represent Browning, and counsel appeared on his behalf on August 18, 2005 (ECF Nos. 7, 10, 11).  As Browning's resentencing was then pending, on February 9, 2007, the court entered an order directing that this action would proceed with regard to guilt phase issues only (ECF No. 25).  Browning amended his habeas petition on August 26, 2008 (ECF No. 48), and again on November 5, 2008 (ECF No. 54).  On July 7, 2009, after Browning's re-imposed death sentence was affirmed on appeal, the court granted Browning leave to file a third amended petition, containing all known claims for relief, including any related to the newly-imposed death sentence (ECF No. 78).  Browning filed his third amended petition on October 19, 2009 (ECF No. 83).

On February 10, 2010, the FPD filed a motion to withdraw from representation of Browning (ECF No. 90).  That motion was granted, and the FPD withdrew on March 22, 2010 (ECF No. 96).  On April 7, 2011, the court appointed new counsel for Browning (ECF Nos. 102, 103, 104).  On October 14, 2011, Browning filed a fourth amended petition (ECF No. 111), and on November 28, 2011, Browning filed a fifth amended petition (ECF No. 115).

On March 7, 2012, respondents filed an answer to the fifth amended petition (ECF No. 122).  On August 24, 2012, Browning filed a reply (ECF No. 131).  On November 26, 2012, respondents filed a response to the reply (ECF No. 150).

When Browning filed his reply, on August 24, 2012, he also filed four motions:  a motion for summary judgment (ECF No. 132), a motion to expand the record (ECF No. 133), a motion for leave to conduct discovery (ECF No. 134), and a motion for evidentiary hearing (ECF No. 135).  The court denied each of those motions on January 24, 2013 (ECF No. 159).  On December 31, 2012, in

the course of the briefing of those motions, Browning filed another motion, a motion to strike, or, alternatively, for evidentiary hearing (ECF No. 156).  The court also denied that motion on January 24, 2013 (ECF No. 159).  In the January 24, 2013, order, the court stated:  "The court will, however, consider Browning's motion to strike or supplement evidentiary hearing request, as well as respondents' response to that motion, in its consideration of the merits of Browning's claims."  Order entered January 24, 2013, p. 11.

On January 30, 2013, Browning filed a motion requesting oral argument on the claims in his fifth amended petition (ECF No. 160).  On April 5, 2013, the court entered an order (ECF No 162) denying the motion for oral argument.  The court stated, regarding oral argument:  "If, after the matter of Browning's unexhausted claims is resolved (see discussion below), and upon closer consideration of the briefing, the court determines that oral argument will be helpful, the court will notify the parties of such and will schedule oral argument."  Order entered April 5, 2013 (ECF No. 162), p. 5.

In the April 5, 2013, order, the court also ruled on the question of the exhaustion of state remedies with respect to the claims in the fifth amended petition, as that issue was raised by respondents in their answer.  *See id*. at 6.  The court found that several claims in Browning's fifth amended petition are unexhausted in state court, and, with respect to those, the court directed Browning to make an election:  Browning was to either file a notice of abandonment of the unexhausted claims, indicating his election to abandon the unexhausted claims and proceed with the litigation of his remaining exhausted claims, or, alternatively, file a motion for stay, requesting a stay of these proceedings to allow him to return to state court to exhaust the unexhausted claims. *See id*. at 31-33.  The court ordered that, if petitioner did not, within the time allowed, file a notice of abandonment of all his unexhausted claims, or a motion for a stay to allow exhaustion of his unexhausted claims in state court, Browning's entire fifth amended habeas petition would be dismissed pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982).  *See id*.

1   On May 3, 2013, Browning filed a motion for reconsideration of the court's April 5, 2013,

2   order (ECF No. 163).  On September 3, 2013, the court granted that motion in part, and denied it in

3   part, finding one further claim in the fifth amended petition to be exhausted.  *See* Order entered

4   September 3, 2013 (ECF No. 172).

5   On July 19, 2013, Browning filed a "Motion to Correct Citations to Docket Number 131

6   (Petitioner's Reply to Respondent's Answer)" (ECF No. 168).  On August 2, 2013, respondents filed

7   a Notice of Nonopposition (ECF No. 170) regarding that motion.  The court granted that motion, in

8   the September 3, 2013, order, ordering that Browning's corrections to the reply described in the

9   motion shall be considered made.  *See* Order entered September 3, 2013 (ECF No. 172), p. 9.

10   Also on July 19, 2013, Browning filed a "Motion to Supplement Citations to Docket Number

11   131 (Petitioner's Reply to Respondent's Answer)" (ECF No. 169).  On August 2, 2013, respondents

12   filed a Notice of Nonopposition (ECF No. 171) regarding that motion.  In the September 3, 2013,

13   order, the court granted that motion as well, ordering that the supplemental citations described in the

14   motion shall be considered included in the reply.  *See* Order entered September 3, 2013 (ECF No.

15   172), p. 9.

16   On October 11, 2013, Browning filed a document entitled "Petitioner's Objection to Stay and

17   Abeyance and Alternative Notice of Abandonment of Claims Deemed Unexhausted, per Court

18   Orders (dkt. 162, 172), Reserving Objections" (ECF No. 173) (hereafter "Notice of Abandonment of

19   Claims").  In that document, Browning declines to make a motion for a stay of this action to allow

20   him to further exhaust claims in state court.  *See* Notice of Abandonment of Claims, pp. 2-4 (stating,

21   in the heading of part A of that document, that Browning "does not request, and objects to, a stay

22   and abeyance").  Browning goes on to state:

23           Should the Court overrule his objection and adhere to its previous rulings
         regarding exhaustion, Petitioner, through counsel of record, hereby gives notice that
24           he abandons the claims this Court has found to be unexhausted, to the extent and only
         to the extent that such abandonment is necessary to permit the Court to consider and
25           rule on his remaining constitutional claims under *Rose v. Lundy*, 455 U.S. 509 (1982).
         In doing this, Petitioner does not intend to waive any of his objections to or
26           arguments against the Court's rulings regarding exhaustion, and he specifically and
         respectfully reserves the right to appeal from the Court's determination that his state

6

1  remedies on those claims have not been exhausted, on the grounds set forth above
2  and all of the grounds previously submitted.

3  *Id*. at 4.  The court notes Browning's objections, and accepts his abandonment of his unexhausted
4  claims.

5       Thus, remaining for resolution on their merits are:  the claims in Claim 1 of Browning's fifth
6  amended petition, at paragraphs 5.1-5.6, 5.7-5.7.3, 5.8-5.8.2, 5.9-5.9.7, 5.10-5.10.4, 5.11-5.11.3 (in
7  part), 5.12-5.12.4 (in part), 5.13-5.13.4, 5.14-5.14.5 (in part), 5.15, 5.16-5.16.4 (in part), and 5.19;
8  Claim 2; Claim 3; the claims in Claim 4 at paragraphs 5.43-5.43.3, 5.44-5.44.2 (in part), 5.45,
9  5.46-5.49 (in part), 5.50-5.51 (in part), and 5.56; the claims in Claim 5 at paragraphs 5.59, 5.60,
10  5.61, 5.62, 5.63, 5.64, and 5.65; the claims in Claim 6 at paragraphs 5.68-5.68.2, 5.69-5.69.2,
11  5.70-5.70.2, 5.71, 5.72-5.72.3, 5.73-5.73.7, 5.74, 5.75, 5.76-5.76.6, 5.77-5.77.3, 5.79, 5.80
12  (in part), 5.81, and 5.83; Claim 7; Claim 10; and Claim 11.  *See* Order entered April 5, 2013
13  (ECF No. 162); Order entered September 3, 2013 (ECF No. 172); Notice of Abandonment of Claims
14  filed October 11, 2013 (ECF No. 173).[3]

15  <u>Standard of Review of the Merits of Browning's Remaining Claims</u>

16       Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254
17  enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply.  *See Lindh v.*
18  *Murphy,* 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000),
19  overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003).

20

21

22       [3]  On October 15, 2013, the court received from Browning, acting pro se, a letter (ECF No. 174),
23  and on January 23, 2014, Browning filed pro se motions (ECF Nos. 175, 176), asserting that his counsel,
    acting against his wishes, left some eighteen claims out of the fifth amended petition, and requesting
24  that the court fashion a procedure for briefing and consideration of those additional claims.  Under Local
    Rule 1A 10-6, "[a] party who has appeared by attorney cannot while so represented appear or act in the
25  case."  Moreover, the court finds no basis in Browning's pro se filings to question the performance of
    his counsel in not including those eighteen additional claims in the fifth amended petition.  The court
26  knows of no authority extending to a habeas petitioner the right to control the choice of claims to be
    asserted by counsel on his behalf.  The court will deny Browning's pro se motions.

7

28 U.S.C. § 2254(d) sets forth the primary standard of review under AEDPA:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Cour's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413).  The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable.  *Id*. (quoting *Williams*, 529 U.S. at 409).

The Supreme Court has further instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has also emphasized "that

1     even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."

2     *Id*. (citing *Lockyer*, 538 U.S. at 75; *see also Cullen v. Pinholster*, 131 S.Ct.1388, 1398 (2011)

3     (describing the AEDPA standard as "a difficult to meet and highly deferential standard for

4     evaluating state-court rulings, which demands that state-court decisions be given the benefit of the

5     doubt") (internal quotation marks and citations omitted).

6           The state court's "last reasoned decision" is the ruling subject to section 2254(d) review.

7     *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010).  If the last reasoned state-court decision

8     adopts or substantially incorporates the reasoning from a previous state-court decision, a federal

9     habeas court may consider both decisions to ascertain the state court's reasoning.  *See Edwards v.*

10     *Lamarque*, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).

11           If the state supreme court denies a claim but provides no explanation at all for its ruling, the

12     federal court still affords the ruling the deference mandated by section 2254(d); in such a case, the

13     petitioner is entitled to federal habeas corpus relief only if "there was no reasonable basis for the

14     state court to deny relief."  *Harrington*, 131 S.Ct. at 784.

15           The analysis under section 2254(d) looks to the law that was clearly established by United

16     States Supreme Court precedent at the time of the state court's decision.  *Wiggins v. Smith*, 539 U.S.

17     510, 520 (2003).

18           The AEDPA standard does not apply where the state supreme court rejected a federal claim

19     on procedural grounds and did not reach its merits.  *Harrington*, 131 S.Ct. at 784-85.  In that case,

20     the federal habeas court reviews the claim de novo, rather than under AEDPA's deferential standard.

21     *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir.2005) (applying de novo standard of review to a

22     claim in a habeas petition that was not adjudicated on the merits by the state court); *Lewis v. Mayle*,

23     391 F.3d 989, 996 (9th Cir.2004) (same).

24

25

26

Analysis

       Trial Counsel's Alleged Inadequate Investigation, Generally

       In Claim 1 of his fifth amended petition, at paragraphs 5.1 to 5.6, Browning makes allegations concerning what he considers to have been his trial counsel's generally inadequate pretrial investigation.  Fifth Amended Petition (ECF No. 115), pp. 7-9.  Those allegations, standing alone, do not state a viable claim for habeas corpus relief.

       In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two prong test for analysis of claims of ineffective assistance of counsel:  a petitioner claiming ineffective assistance of counsel must demonstrate (1) that his attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 688; *see also id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694.

       Without tethering general claims regarding the alleged minimal investigation done by trial counsel to particular effects of the insufficient investigation, Browning cannot establish ineffective assistance of counsel, in violation of his constitutional rights, under *Strickland.*  Therefore, the allegations in paragraphs 5.1 to 5.6 of Browning's fifth amended petition do not, in themselves, set forth a viable habeas claim.  Those allegations can only be read as introduction to, and in conjunction with, Browning's specific claims regarding the investigation done by his trial counsel, which are discussed below.

       The Bloody Shoe Prints

       Browning asserts claims concerning bloody shoe prints found at the scene of the murder.

       In Claim 1, at paragraphs 5.7 to 5.7.3, Browning claims that, had his trial counsel conducted a sufficient investigation, he would have learned, and the jury would have heard:

          (a) that Officer Branon was the first officer to arrive at the scene, and when he arrived the bloody shoe prints were already there; (b) that the paramedics arrived after

1    Officer Branon so they could not have left the prints; (c) that Officer Branon told
     Mr. Horn that he saw the bloody shoeprints there before anyone arrived – including
2    Mr. Horn and the paramedics; and (d) that the bloody prints were too big to have
     been left by either Ms. Coe or Mrs. Elsen, who had been in the jewelry store before
3    Officer Branon's arrival.

4    Fifth Amended Petition, p. 10, ¶ 5.7.2.

5         Browning raised this claim on the appeal in his state habeas action.  *See* Appellant's Opening

6    Brief, Exhibit 232, p. 43 (ECF No. 59-174, p. 29).  The Nevada Supreme Court considered

7    Browning's claim of ineffective assistance of counsel, regarding his counsel's investigation of the

8    bloody shoe prints, and ruled as follows:

9              Browning also contends that his trial counsel was ineffective in failing to
          learn that bloody shoeprints near Elsen were already present when Officer Branon
10        arrived at the crime scene.  Because the prints did not match Browning's shoes and
          could not have been left by paramedics, who arrived after Officer Branon, Browning
11        argues that this information indicated that another person committed the murder.
          We conclude that this information was not material and that trial counsel acted
12        reasonably.  Counsel explained at the evidentiary hearing that once he determined
          that the shoeprints did not match Browning's shoes, he chose not to investigate the
13        prints further.  He feared that investigation might establish that the prints had been
          left by police or paramedics, rather than some unidentified person.  As long as the
14        source of the prints was unknown, counsel could argue to the jury that the actual
          murderer had left them.  Although it is now evident that the prints were present
15        before police and paramedics arrived, counsel's basic reasoning remains sound
          because the bloody shoeprints were likely left by Mrs. Elsen and/or Coe, who were
16        with Elsen before the first officer arrived.  Counsel made a reasonable, tactical
          decision to leave the source of the prints uncertain.

17

18   *Browning v. State*, 120 Nev. 347, 356, 91 P.3d 39, 46 (2004).  This court recognizes that there is

19   evidence suggesting that the bloody shoe prints likely were not left by Mrs. Elsen or Mrs. Coe, but

20   finds, nonetheless, that the Nevada Supreme Court's conclusion, regarding trial counsel's strategic

21   decision to leave the source of the prints uncertain, was reasonable.  *Strickland* requires courts to

22   indulge a strong presumption that counsel's conduct was within the wide range of reasonable

23   professional assistance, as it is all too easy to conclude in hindsight that a particular act or omission

24   was unreasonable.  *See Strickland*, 466 U.S. at 689.  The Nevada Supreme Court's ruling on this

25   claim was a reasonable application of *Strickland*, and it was not based on an unreasonable

26   determination of the facts in light of the evidence presented.

1    In Claim 4, at paragraphs 5.43 to 5.43.3, Browning claims, under *Brady v. Maryland*, 373

2   U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), that the prosecution withheld

3   exculpatory information, and presented testimony that was misleading or false, when it presented the

4   trial testimony of David Horn, a Las Vegas Metropolitan Police Department (LVMPD)

5   identification specialist, whose testimony suggested, in essence, that the bloody shoe prints were

6   likely left by paramedics or off duty detectives. *See* Fifth Amended Petition, pp. 39-40, ¶ 5.43-

7   5.43.3. Browning contends that "[t]he prosecutor and Officer Horn knew or reasonably should have

8   known that bloody prints could not have been left by the paramedics or anyone working the crime

9   scene since Officer Branon was the first officer to arrive at the scene and he noticed the bloody

10   prints before any back-up arrived." *Id*. at 40, ¶ 5.43.1.

11    Browning raised these claims on the appeal in his state habeas action. *See* Appellant's

12   Opening Brief, Exhibit 232, p. 30 (ECF No. 59-174, p. 16. The Nevada Supreme Court ruled as

13   follows:

> ... Browning contends that the State withheld the fact ... that bloody shoeprints
> near the victim were already present when the first police officer arrived at the crime
> scene. We have already concluded that this information was not material in rejecting
> Browning's contention that his trial counsel was ineffective. We further conclude
> that under *Brady* the State did not withhold this information because it was
> reasonably available to the defense, as Browning acknowledges by claiming that his
> counsel should have interviewed the officer and discovered it. [Footnote: *See Steese
> v. State*, 114 Nev. 479, 495, 960 P.2d 321, 331 (1998).]

19   *Browning*, 120 Nev. at 370 91 P.3d at 55. The court finds this ruling by the Nevada Supreme Court

20   to be reasonable. Browning has not shown that any evidence regarding Officer Branon's

21   observations at the scene of the murder was withheld from the defense. The testimony of Officer

22   Branon on which Browning relies in his attempt to show a *Brady* violation – that he was the first at

23   the scene, and when he arrived the bloody shoe prints were already there – was not given until the

24   evidentiary hearing in 1999, fourteen years after trial. *See* Testimony of Gregory Branon at

25   Evidentiary Hearing, Exhibit 182, pp. 153-82 (ECF No. 59-145, p. 36 - ECF No. 59-146, p. 24).

26   And, despite the importance of such information to the investigation of Hugo Elsen's murder, that

1   information does not appear in Officer Branon's three-page police report. *See* Officer Branon's

2   November 8, 1985, Police Report, Exhibit 202 in support of Browning's First Amended Petition

3   (ECF No. 37-18, pp. 91-93). Moreover, there is no credible evidence that Officer Branon told

4   anyone this information before the 1999 evidentiary hearing.

5         Browning claims that there is evidence that Officer Branon told Officer Horn, at the scene of

6   the murder, that when he arrived the bloody footprints were already there; in making that argument,

7   Browning relies on the following testimony of Officer Branon at the 1999 evidentiary hearing held

8   in Browning's state habeas action:

9         Q.     Did you tell anyone about the bloody footprints upon entering the store?

10        A.     I would have mentioned it to Criminalistic's Specialist Horn when he got
          there.

11

12  Testimony of Gregory Branon at Evidentiary Hearing, Exhibit 182, p. 171. This court does not find

13  that testimony to be credible. Officer Branon did not testify that he actually told Officer Horn; he

    testified -- some 15 years after the event -- that he "would have."

14

15        Furthermore, Officer Horn testified at trial as follows:

16        Q.     Now, you mentioned the bloodstain. ... Can you tell whether or not you
          discovered a footprint in that particular bloodstain?

17              *   *   *

18        A.     There was a tennis shoe design in the bloodstain and it led away from the
          bloodstained area towards the east, front door.....

19              *   *   *

20

21        Q.     ... [A]re you familiar in this case with a man by the name of Paul Lewis
          Browning?

22        A.     Yes, I am.

23        Q.     Did you see him later that evening?

24        A.     Yes, I did.

25        Q.     And what was the purpose of your seeing Mr. Browning?

26        A.     The purpose was to check the footwear that he was wearing to see if it might
          match what I found in the store.

1    Q.    Did it match?

2    A.    No, it did not.

3                                    *    *    *

4    Q.    (By Mr. Seaton [prosecutor])  What investigation did you do?

5    A.    None.

6    Q.    Were you given any information that caused you not to do any investigation?

7    A.    Yes, I was.

8                                    *    *    *

9    Q.    (By Mr. Seaton)  How do you determine whether or not you should do further
     investigation in something like this footprint?

10                                   *    *    *

11
     A.    If it was – if I deemed it critical or someone from the detective side of the
12   police department thought it critical, the personnel that had responded to the crime
     scene at 521 Las Vegas Boulevard South would have been contacted either through
13   the Mercy Ambulance attendant or if it was the fire department that responded we
     could have obtained those names of the people that had gone to that address,
14   contacted them, even brought them back to the scene if needed to compare to or see
     what kind of footwear that they were wearing at the time they initially arrived to the
15   address at the Hugo Elsen Jewelry Store.

16   Q.    Have you been to many scenes where paramedics have been?

17   A.    Numerous.

18   Q.    Do they wear tennis shoes?

19   A.    They sometimes do.  More often than not they do because a lot of times they
     work with their feet a lot and anything that's more comfortable for them that's
20   generally what they will wear.

21   Q.    Do detectives come to the scene who were off duty?

22   A.    The only off-duty people that would come to such a crime scene would be
     your homicide detail.  Everyone else from general detail, patrol, the crime lab people
23   would be on duty.

24   Q.    People like Detective Leonard?

25   A.    Right.

26   Q.    The man in charge of this case if he were off duty?

                                     14

1  A. He would show up, yes.

2  Q. Do they come in tennis shoes ever?

3  A. At times I have seen them wear tennis shoes.

4  Q. And did [you] ever think that it was critical to go look at all of the shoes of all of the people who had been in that building on that particular night?

5

  A. No, I did not.

6

7 Trial Testimony of David Randall Horn, Exhibit 46, pp. 209-13 (ECF No. 59-29, pp. 14-18). It

8 appears from Officer Horn's testimony that his decision not to further investigate the shoe prints was

9 based on what he was told by other officers at the scene. In light of the trial testimony of Officer

10 Horn, the court finds incredible Officer Branon's testimony, some 15 years after the event, that he

11 "would have" told Officer Horn that the bloody shoe prints were present when he first arrived at the

12 scene before anyone else.

13  Moreover, it is not clear from the evidence that Officer Branon was in fact, by himself, the

14 first officer to arrive at the murder scene. Browning's claims regarding the bloody shoe prints are

15 premised on his assertion that "... Officer Branon was the first officer to arrive at the scene and he

16 noticed the bloody prints before any back-up arrived." Fifth Amended Petition, p. 40. At trial,

17 however, Officer Branon testified as follows:

18  Q. Officer Branon, you were one of the first two officers to arrive at the scene. Isn't that true?

19

  A. Yes, sir.

20

  Q. And you were there with Officer Robertson?

21

  A. Yes, sir.

22

23 Trial Testimony of Gregory Branon, Exhibit 49, p. 537 (ECF No. 59-41, p. 19). And, in his police

24 report, written on the day of the murder, Officer Branon wrote:

25  Upon my arrival at Hugo's Jewelers, a short time thereafter, I made my way to the front of the jewelry store, at which time I was able to look within and observe an
26  elderly white female adult, later identified as Josey Elsen, the wife of the owner, Hugo Elsen, walking back and forth within the business.

It was at approximately this time that Officer R. Roberston and Officer D. Radcliffe responded to my location to assist me.  It was at this time that I gently knocked upon the glass door at the front of the business, which is located on the eastside of the building, which attracted the attention of Mrs. Elsen, who responded to the door, opened it and explained her husband had been stabbed.

At this time both I and Officer Robertson entered the store, making a quick check on the interior, then contacting the victim, one Hugo Elsen, who was lying in a conscious state on the floor on his back at the northeast corner of the store.

Exhibit 202 in support of Browning's First Amended Petition, p. 1 (ECF No. 37-18, p. 91).

At trial, the prosecution presented the testimony of David Radcliffe, one of the other LVMPD patrol officers who responded to the scene of the murder.  *See* Trial Testimony of David Radcliffe, Exhibit 48, pp. 340-63 (ECF No. 59-35, pp. 4-27).  Officer Radcliffe testified as follows regarding his arrival at the scene:

> Q.     .... Did you arrive with the other initial responding officers?
>
> A.     Officer Robertson and Officer Branon.  They were all in separate units, but they arrived probably ten or fifteen seconds prior to me.

Trial Testimony of David Radcliffe, Exhibit 48, p. 361.  Officer Radcliffe also testified as follows:

> Q.     When you arrived there did you drive up to the front of the business?
>
> A.     There were two other units in front.  I parked in the two-way turn lane just south of the business.
>
> Q.     Did you meet with other police officers there?
>
> A.     Yes, I did.
>
> Q.     Who were they, specifically?
>
> A.     Officer Branon and Officer Robertson.
>
> Q.     Did the three of you go into the business at 520 Las Vegas Boulevard South?
>
> A.     Yes, we did.

*Id*. at 3.

In sum, Officer Branon's testimony at the 1999 evidentiary hearing is not such as to compel a finding that Officer Horn's trial testimony was false or misleading.  And, there is no showing by

16

1  Browning that the prosecution failed to disclose to the defense any material exculpatory information

2  in this regard.  This court finds reasonable the Nevada Supreme Court's ruling that Browning did not

3  show that the prosecution wrongfully failed to disclose information regarding Officer Branon's

4  observations or that such information was material, and the court finds that Browning has not shown

5  Officer Horn's testimony to be misleading or false.

6      The Jacket

7      Browning makes claims regarding a jacket that was found in the room where he was arrested

8  and that was shown to have blood on it, with the same blood type (type B) as the victim, Hugo

9  Elsen.

10      In Claim 1, at paragraphs 5.8 through 5.8.2, Browning claims that, "[h]ad trial counsel

11  conducted pre-trial investigation into this claim, such as interviewing the state's criminologist or

12  conducting an independent analysis of the blood on the jacket, using tests that were readily available

13  at the time, the jury would have learned that the premise of [the] prosecutor's argument was wrong

14  since the blood on the jacket did not belong to the victim."  Fifth Amended Petition, p. 11, ¶ 5.8.2.

15      Browning raised this claim in a footnote in his opening brief on the appeal in his state habeas

16  action.  *See* Appellant's Opening Brief, Exhibit 232, p. 23, n.11 (ECF No. 59-174, p. 9).  Before the

17  state district court, however, Browning made no evidentiary showing that there was available, at the

18  time of trial, a more advanced method of blood analysis that could have shown that the blood on the

19  jacket was not Mr. Elsen's.  The state district court, therefore, ruled as follows:

20          Defendant claims that Mr. Pike [Browning's trial counsel] was ineffective
        for failing to conduct independent testing on the jacket.  Defendant then argues that
21      Mr. Pike should have done RFLP DNA testing and that would have determined that
        the blood was not Hugo Elsen's.  This is a recurring theme throughout Defendant's
22      argument.  However, there is no evidence in the record that RFLP DNA testing was
        available in 1986.  Nor is there evidence that there was a sufficient amount of blood
23      on the jacket in order to test using RFLP.  Moreover, it should be noted that
        Defendant never conducted an RFLP test.  In the stipulation between the parties filed
24      January 10, 2001, the test used on the three strands of fiber was AmpF/STR Profiler
        Plus PCR Amplification Kit.  Unless Defendant could prove that test was available in
25      1986, which he has not, counsel cannot be faulted for not having used such a test.

26  Findings of Fact, Conclusions of Law and Order, Exhibit 230, p. 5 (ECR No. 59-171, p. 7).  On the

appeal from the denial of his state habeas petition, Browning raised the issue in a footnote in a

section of his opening brief dealing with alleged prosecutorial misconduct.  *See* Appellant's Opening

Brief, Exhibit 232, p. 23.  In his reply brief on that appeal, Browning argued that "[w]hile this DNA

testing was not available at the time, there were other tests in common use that were much more

discriminating than the simple ABO typing...."  Appellant's Reply Brief, Exhibit 251, p. 16.  In a

footnote to that assertion, Browning cited to caselaw in which there were references to blood

enzyme testing evidence.  *See id*., p. 16 n.3.  However, it remained that Browning had not made any

evidentiary showing that any more sophisticated blood testing was available to defense counsel, or

that blood enzyme testing, or any other blood testing available at the time of trial, could have shown

that the blood on the jacket was not Mr. Elsen's.  Absent such an evidentiary showing, Browning's

claim was plainly without merit, and the Nevada Supreme Court so held:

> Finally, Browning claims in a footnote that trial counsel was ineffective for failing to perform more precise testing of the State's blood evidence. He has not provided any cogent argument, legal analysis, or supporting factual allegations; thus, this claim warrants no consideration.

*Browning v. State,* 120 Nev. 347, 361, 91 P.3d 39, 50 (2004).  In light of the evidence -- or, rather,

the lack of it -- regarding this issue, the ruling by the Nevada Supreme Court was reasonable.

Browning did not show that his trial counsel had available any method of blood testing that could

have shown that the blood on the jacket was not Mr. Elsen's.

In Claim 4, at paragraph 5.45, Browning makes a *Napue* claim involving the prosecution's

evidence regarding the jacket:

> At trial, the prosecution elicited testimony from Ms. Adkins, an identification specialist with the Las Vegas Police, that upon entering the Wolfes' apartment she observed a tan jacket on top of the bed, near the location where Mr. Browning was alleged to have been sitting.  The jacket was alleged to have belonged to Mr. Browning and alleged to have the victim's blood on it.  None of this was true.  The testimony was false and the prosecutor did nothing to correct it.  According to Ms. Adkins own Evidence Impound Report, the tan jacket was not recovered on the bed next to Mr. Browning, but rather on the floor of the Wolfe's closet.

Fifth Amended Petition, p. 42, ¶ 5.45 (citations omitted).

18

1    Browning raised this claim before the Nevada Supreme Court on the appeal in his state

2  habeas action.  *See* Appellant's Opening Brief, Exhibit 232, pp. 21-24 (ECF No. 59-174, pp. 7-8).

3  The Nevada Supreme Court ruled on this claim as follows:

> Browning claims that the prosecutor presented false evidence regarding blood found
> on Browning's coat, which was type B blood like the victim's.  The prosecutor
> argued to jurors that the blood on the coat belonged to the victim, though he also
> conceded that other people have type B blood.  DNA testing after the trial revealed
> that the blood was not the victim's.  Because this is an independent claim of
> prosecutorial misconduct, Browning must demonstrate good cause for failing to raise
> it earlier and actual prejudice.  Browning sought DNA testing of the bloodstain in
> November 1999.  He does not attempt to establish good cause and explain why he did
> not raise the claim earlier.  But even if Browning could show good cause, he cannot
> demonstrate prejudice.  Although the prosecutor was wrong that the blood belonged
> to the victim, the evidence he relied on was not false: the blood on the coat was the
> same type as the victim's.  Therefore, no prosecutorial misconduct occurred.

11  *Browning,* 120 Nev. at 368, 91 P.3d at 54 (footnote omitted).  This ruling was reasonable.  Browning

12  made no showing that the evidence presented by the prosecution regarding the jacket was false.

13    Browning claims in Claim 6, at paragraph 5.71, that his trial counsel was ineffective for

14  failing to object to the following characterization of the jacket by the prosecutor in his closing

15  argument:

> The jacket that had Mr. Hugo Elsen's blood on it that Paul Browning was wearing
> when he killed him.  This proves his guilt probably as much as anything, maybe as
> much as the identification by Coe and Woods and poor Mrs. Elsen.

18  Fifth Amended Petition, pp. 61-62; *see also* Trial Transcript, Exhibit 51, p. 655 (ECF No. 59-47,

19  p. 12).  Browning raised this claim, in a footnote in his opening brief on the appeal in his state

20  habeas action.  *See* Appellant's Opening Brief, Exhibit 232, p. 23 n. 11 (ECF No. 59-174, p. 9).

21  As is discussed above, however, the Nevada Supreme Court held the argument by the prosecutor,

22  that the blood on the jacket was the victim's, to be permissible, based on the evidence admitted at

23  trial.  In view of that ruling by the Nevada Supreme Court, an objection by Browning's counsel

24  would have been futile.  The Nevada Supreme Court's ruling, that counsel was not ineffective for

25  failing to make such an objection, was not objectively unreasonable.

26

Browning also claims, in Claim 6, at paragraphs 5.77 through 5.77.3, that his trial counsel was ineffective in that he "allowed the prosecution to present a photograph of Mr. Browning wearing the jacket that Mr. Pike had Mr. Browning try on before the jury to demonstrate that it did not belong to him." Fifth Amended Petition, p. 69, ¶ 5.77.

Browning raised a similar claim on the appeal in his state habeas action (*see* Appellant's Opening Brief, Exhibit 232, pp. 49-50 (ECF No. 59-175, pp. 2-3), and the Nevada Supreme Court ruled as follows:

> ... Browning claims that counsel should have objected to admission of a mug shot, which allowed the jury to infer that Browning had been involved in prior criminal activity. We conclude that the photo had no appreciable prejudicial effect since jurors had no reason to assume that it had been taken in any other case but the one for which Browning was being tried.

*Browning,* 120 Nev. at 358, 91 P.3d at 47. This court agrees with the ruling of the Nevada Supreme Court, and finds that court's ruling was not objectively unreasonable. Even assuming that an objection might possibly have been sustained, and that Browning's counsel should reasonably have made such an objection, there is no showing of any reasonable probability that, had such an objection been made, the outcome of the trial would have been different.

### The Wolfes' Credibility

Next, Browning makes claims concerning the credibility of Randall and Vanessa Wolfe, witnesses presented by the prosecution.

In Claim 1, at paragraphs 5.9 through 5.9.7, 5.12 through 5.12.4, and 5.16 through 5.16.4, Browning claims that his counsel was ineffective for failing to better investigate issues relating to the credibility of the Wolfes, and better impeach the Wolfes' testimony. Fifth Amended Petition, pp. 11-13, 16-18. Browning asserted this claim on the appeal in his state habeas action. *See* Appellant's Opening Brief, Exhibit 232, pp. 42-43, 47-48 (ECF No. 59-174, pp. 28-29, 33-34). The Nevada Supreme Court ruled on this claim as follows:

> ... Browning claims that counsel should have interviewed Randy and Vanessa Wolfe, the State's key witnesses. Counsel testified that to avoid becoming a witness himself, he had a policy of not personally interviewing witnesses. Instead, he had his investigator conduct all interviews. This is a reasonable tactic. The investigator

1  gathered enough information to permit trial counsel to adequately cross-examine the
2  Wolfes on their version of events, their drug usage, their informer status, their lying,
   and their convictions and arrests.  Therefore, Browning has failed to show that
   counsel was ineffective.
3

4  *Browning,* 120 Nev. at 356, 91 P.3d at 44.  This court concurs with the ruling of the Nevada

5  Supreme Court that Browning's counsel was able to adequately cross-examine the Wolfes.

6       Browning's counsel's cross-examination of Randall Wolfe was effective, in that counsel

7  elicited evidence that Randall Wolfe used heroin and other drugs, that he committed thefts to

8  support his drug use, that he used several aliases, that he lived off the proceeds of Vanessa's

9  prostitution, and that he had been convicted of three felonies, including sale of a controlled

10 substance, escape from prison, and attempted possession of stolen property.  Trial Testimony of

11 Randall Wolfe, Exhibit 48, pp. 390-95, 399-403, 406-08, 411 (ECF Nos. 59-36 and 59-37).  Counsel

12 also elicited testimony from Randall Wolfe showing that he received special treatment in a pending

13 case in exchange for his testimony in Browning's case.  *Id*. at 396-97, 403-08.  Counsel also showed

14 that Randall Wolfe perjured himself at Browning's preliminary hearing, but likely would not be

15 charged.  *Id*. at 397-99.  This court concludes that Browning has not shown that any further

16 investigation of Randall Wolfe would have resulted in such a better cross-examination that there

17 would have been a reasonable probability of a better result for Browning at trial.  *See Strickland*, 466

18 U.S. at 688, 694.

19      Similarly, in this court's view, Browning's counsel's cross-examination of Vanessa Wolfe

20 was effective; counsel elicited testimony showing that she used heroin and cocaine, that she had

21 "run con games" in California, and that she had learned that Randall had kept jewelry from the

22 robbery of the Elsens' jewelry store.  Trial Testimony of Vanessa Wolfe, Exhibit 48, pp. 442-52

23 (ECF No. 59-38, pp. 8-18).  The court concludes that Browning has not shown that any further

24 investigation of Vanessa Wolfe would have resulted in such a better cross-examination that there

25 would have been a reasonable probability of a better result for Browning at trial.

26

1      In Claim 4, at paragraphs 5.46 to 5.51, Browning claims, under *Brady v. Maryland*, 373 U.S.

2   83 (1963), that the prosecution withheld from the defense information related to the credibility of

3   Randall and Vanessa Wolfe.  Fifth Amended Petition, pp. 42-47.  Browning raised these claims on

4   the appeal in his state habeas action.  *See* Appellant's Opening Brief, Exhibit 232, pp. 24-29 (ECF

5   No. 59-174, pp. 10-15).

6      With respect to Vanessa Wolfe, the Nevada Supreme Court denied this claim without any

7   discussion.  Browning did not make a showing in state court that any material information regarding

8   Vanessa Wolfe's credibility was withheld from the defense, and this court, therefore, finds

9   reasonable the state court's summary rejection of that *Brady* claim.

10      With respect to Randall Wolfe, the Nevada Supreme Court ruled as follows on this *Brady*

11   claim:

12          First, the prosecutor withheld information regarding benefits given to an important
         witness for the State, Randy Wolfe.  At trial, Wolfe denied receiving or expecting any
13          benefits for his testimony.  However, at that time Wolfe was the defendant in a
         separate criminal prosecution, and the prosecutor admitted at the post-conviction
14          evidentiary hearing that after Browning's trial he told the district judge assigned to
         Wolfe's case that Wolfe had helped in prosecuting Browning; he also admitted that
15          he later helped Wolfe acquire a job.  Though the prosecutor maintained that he acted
         unilaterally and never made any deal with Wolfe, this information still should have
16          been disclosed to the defense.  Under *Brady*, even if the State and a witness have not
         made an explicit agreement, the State is required to disclose to the defense any
17          evidence implying an agreement or an understanding.  [Footnote:  *Jimenez v. State*,
         112 Nev. 610, 622, 918 P.2d 687, 694-95 (1996).]  The next question is whether there
18          is a reasonable probability of a different result if this information had been disclosed.
         We conclude the answer is no.  Wolfe's credibility was extensively challenged at
19          trial.  The jury was made aware that he had initially kept some of the stolen jewelry
         in this case for himself and lied under oath about doing so.  On cross-examination,
20          defense counsel also established that Wolfe had a history of heroin and other illegal
         drug use and had used heroin just four days before testifying, had stolen property and
21          pimped his wife to support his drug use, had three prior felony convictions, and still
         faced sentencing for one of those convictions.  Thus, though the jurors were not told
22          that Wolfe would receive benefits for his testimony, he was stiffly impeached on
         other grounds.  Moreover, strong evidence corroborated his testimony, most notably
23          the discovery of Browning with the stolen jewelry right after the murder.  So
         considering this issue alone, there is not a reasonable probability of a different result
24          if the information in question had been disclosed.

25   *Browning,* 120 Nev. at 369-70, 91 P.3d at 54-55.  The Nevada Supreme Court, therefore, held that

26   the prosecutor failed to disclose to the defense his practice -- evidently unknown to Randall Wolfe

22

1   -- of assisting witnesses for the State who face sentencing in their own cases, by informing the

2   sentencing court of their cooperation; however, the Nevada Supreme Court held that Browning was

3   not prejudiced.  Despite the non-disclosure identified by the Nevada Supreme Court, Browning's

4   counsel established on cross-examination of Randall Wolfe: that Wolfe had been permitted to plead

5   guilty to a lesser charge, when he originally was eligible for "habitual criminal" treatment; that

6   Wolfe's sentencing was still pending; that, despite a history of failing to appear in court as ordered,

7   Wolfe was released on his own recognizance; and that, despite confessing to felony possession of

8   stolen property and perjury, there  appeared to be no intent to charge Wolfe with those offenses.

9   *See* Trial Testimony of Randall Wolfe, Exhibit 48, pp. 396-99, 403-08 (ECF No. 59-36, pp. 29-32,

10   and ECF No. 59-37 pp. 5-10).  In light of counsel's cross-examination of Randall Wolfe, it was not

11   objectively unreasonable for the Nevada Supreme Court to determine that there was no reasonable

12   probability that the outcome of the trial would have been affected by the additional revelation that

13   the prosecutor, unbeknownst to Wolfe, intended to put in a good word for Wolfe at the time of his

14   sentencing because of his testimony at Browning's trial.

15         <u>The Identification of Browning by Josy Elsen</u>

16         Josy Elsen was the wife of the murder victim, Hugo Elsen.  At trial, Josy Elsen identified

17   Browning as the person she saw stab her husband.  Trial Testimony of Josy Elsen, Exhibit 46,

18   pp. 263-67 (ECF No. 59-31, pp. 10-14).  Browning makes claims in his fifth amended habeas

19   petition regarding Josy Elsen's identification of him as the murderer.

20         In Claim 1, at paragraphs 5.10 through 5.10.4, Browning claims that his counsel was

21   ineffective for failing to interview Josy Elsen or obtain a crime scene sketch of the jewelry store, to

22   learn that, given the angle of her view and the layout of the store, Josy Elsen could not identify her

23   husband's murderer.  Fifth Amended Petition, pp. 13-15.  Browning asserted this claim on the

24   appeal in his state habeas action.  *See* Appellant's Opening Brief, Exhibit 232, pp. 43, 45-46 (ECF

25   No. 59-174, pp. 29, 31-33).  The Nevada Supreme Court ruled as follows:

26

1        Browning complains that his counsel also failed to interview Mrs. Elsen, the
victim's wife.  According to Browning, Mrs. Elsen would likely have admitted that

2        she could not identify her husband's assailant, enabling counsel to demonstrate that
her in-court identification was unreliable.  This claim lacks merit.  Mrs. Elsen was

3        asked on one occasion to identify Browning in a photographic lineup shortly after the
crimes occurred.  She was unable to do so; however, at trial she identified Browning

4        as her husband's attacker.  She qualified this identification by stressing that she only
saw the perpetrator from the side.  She did state that the attacker was a black man

5        wearing a blue cap.  Although counsel did not personally interview Mrs. Elsen, he
adequately cross-examined her regarding the identification.  After she made her

6        in-court identification, counsel specifically asked the court to note for the record that
Browning was the only black man in the room and that he was seated at the defense

7        table.  In addition, counsel pointed out during closing argument that although
Mrs. Elsen could not identify Browning at the photographic lineup a month after the

8        crimes, one year later she somehow identified him.  Finally, the result if counsel had
interviewed Mrs. Elsen is completely speculative, and this speculation does not

9        demonstrate any prejudice.

10   *Browning,* 120 Nev. at 356-57, 91 P.3d at 46-47 (footnote omitted).  In this court's view,

11   considering the hesitant nature of Josy Elsen's identification of Browning at trial, her testimony

12   about her limited view of the murderer, and Browning's counsel's arguments regarding her

13   identification, the jury was able to fairly weigh the value of Josy Elsen's identification of Browning

14   as the murderer.  Furthermore, in addition to hearing Josy Elsen's testimony about her limited view

15   of the murderer, Browning's trial counsel testified at the evidentiary hearing in Browning's state

16   habeas proceeding, that he personally visited the jewelry store to observe the scene of the crime.

17   Testimony of Randall Pike at Evidentiary Hearing, Exhibit 181, pp. 259-60 (ECF No. 59-141,

18   pp. 19-20).  This court, therefore, finds the state supreme court's ruling on this claim, rejecting the

19   claim of ineffective assistance of counsel, to be objectively reasonable.

20        In Claim 6, at paragraphs 5.73 through 5.73.7, Browning claims that his counsel was

21   ineffective for failing to move to exclude the testimony of Josy Elsen identifying Browning as the

22   murderer.  Fifth Amended Petition, pp. 63-65.  Browning asserted this claim in his state habeas

23   action.  At the evidentiary hearing in that action, Browning's trial counsel testified as follows:

24        Based on my experience with the district courts, both as a prosecutor and defense
attorney, the judge would have allowed the identification to have gone forward and

25        would have directed me to just attack credibility of it.

26

1   Testimony of Randall Pike at Evidentiary Hearing, Exhibit 181, p. 258 (ECF No. 59-141, p. 18).

2   After the state district court denied the claim, Browning raised the claim on appeal.  *See* Appellant's

3   Opening Brief, Exhibit 232, pp. 50-53 (ECF No. 59-175, pp. 3-6).  The Nevada Supreme Court ruled

4   as follows:

5               Browning also claims that trial counsel was ineffective for failing to move to
        exclude Mrs. Elsen's in-court identification of Browning.  On direct appeal, this court

6       ruled that although Mrs. Elsen failed to identify Browning before trial, the in-court
        identification was admissible.  [Footnote: *See Browning*, 104 Nev. at 274, 757 P.2d at

7       354.]  Therefore, Browning cannot demonstrate prejudice because the underlying
        claim has already been considered and rejected by this court.

8

9   *Browning,* 120 Nev. at 357, 91 P.3d at 47.  Browning's counsel made a reasonable tactical decision

10  not to make what he expected would be a futile motion to exclude Josy Elsen's identification, and,

11  at any rate, given the Nevada Supreme Court's rulings on the question of the admissibility of the

12  identification (*see Browning*, 104 Nev. at 274, 757 P.2d at 354; *Browning*, 120 Nev. at 357, 91 P.3d

13  at 47), it is plain that a motion to exclude the identification would have failed.  *See also* Trial

14  Transcript, Exhibit 46, pp. 301-02 (ECF No. 59-32, pp. 18-19) (denial of motion for mistrial based

15  on Josy Elsen's identification of Browning as the murderer).  The Nevada Supreme Court's ruling

16  on this claim was not objectively unreasonable.

17      In Claim 7, citing *Stovall v. Denno*, 388 U.S. 293 (1967), and *Manson v. Brathwaite*, 432

18  U.S. 98 (1977), Browning claims that Josy Elsen's in-court identification of Browning as the

19  murderer was unconstitutionally unreliable.  Browning raised such a claim on his direct appeal, and

20  the Nevada Supreme Court denied the claim.  *See* Appellant's Opening Brief, Exhibit 84, pp. 28,

21  30-31 (ECF No. 59-60, pp. 16, 18-19); Appellant's Supplemental Opening Brief, Exhibit 87,

22  pp. 15-18 (ECF No. 59-61, pp. 24-27).

23      Browning argues that Josy Elsen's identification lacked an "independent source," which is

24  required under *Stovall* and *Manson*.  *See* Reply (ECF No. 131), p. 151.  That argument is without

25  merit, however; it is beyond dispute that Josy Elsen witnessed a man stabbing her husband.  There

26  was an independent source for her in-court identification of Browning.

1    More fundamentally, however, *Stovall* and *Manson* do not apply to Josy Elsen's in-court

2  identification of Browning in this case because "the Due Process Clause does not require a

3  preliminary judicial inquiry into the reliability of an eyewitness identification when the

4  identification was not procured under unnecessarily suggestive circumstances arranged by law

5  enforcement." *Perry v. New Hampshire,* ___ U.S. ___, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012).

6  In *Perry*, the Court explained that the dangers of identification testimony are ordinarily to be

7  combated by the safeguards inherent in the criminal justice system, including the rights of counsel,

8  compulsory process, and confrontation, and that the reliability of identifications is generally to be

9  determined by the finder of fact.  As the Supreme Court observed in *Perry*, all in-court

10  identifications "involve some element of suggestion."  *Perry*, 132 S.Ct. at 727.

11    In a recent Ninth Circuit Court of Appeals decision, that court explained the limited nature of

12  the substantive due process right established in  *Stovall* and *Manson*:

13    In only one line of cases has the Supreme Court held that the mere admission
of evidence amounts to a denial of due process, and that's where police manipulate an

14  eyewitness to identify the defendant as the culprit.  The Court announced this rule in
*Stovall v. Denno*, 388 U.S. 293, 301-02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and

15  has been backpedaling ever since.  *See, e.g.*, *Manson v. Brathwaite*, 432 U.S. 98, 117,
97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 201, 93 S.Ct.

16  375, 34 L.Ed.2d 401 (1972); *Coleman v. Alabama*, 399 U.S. 1, 5, 90 S.Ct. 1999, 26
L.Ed.2d 387 (1970); *Simmons v. United States*, 390 U.S. 377, 386, 88 S.Ct. 967, 19

17  L.Ed.2d 1247 (1968).  *But see  Foster v. California*, 394 U.S. 440, 443, 89 S.Ct.
1127, 22 L.Ed.2d 402 (1969).

18

19    The latest case in the *Stovall* line ... is particularly instructive.  In *Perry v.
New Hampshire*, ___ U.S. ___, 132 S.Ct. 716, 725, 181 L.Ed.2d 694 (2012), the
eyewitness identified the suspect in a suggestive setting, but this happened by

20  accident, rather than as a result of police manipulation.  By a decisive margin, the
Supreme Court declined to find a due process violation.  *Id*. at 730.  Justice Ginsburg

21  starts her analysis with words that our colleagues in the other circuits should read
twice:

22
The Constitution, our decisions indicate, protects a defendant against a

23  conviction based on evidence of questionable reliability, not by
prohibiting introduction of the evidence, but by affording the

24  defendant means to persuade the jury that the evidence should be
discounted as unworthy of credit.

25
*Id*. at 723.

26

The Court goes on to reject Perry's argument that "trial judges [must] prescreen eyewitness evidence for reliability any time an identification is made under suggestive circumstances." *Id*. at 725.  Instead, exclusion of the evidence is appropriate only "to deter law enforcement use of improper lineups, showups, and photo arrays." *Id*. at 726.  In another passage our colleagues might pin to their robes, the Court held:

> We have concluded in other contexts ... that the potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair....  We reach a similar conclusion here: The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness.

*Id*. at 728 (citing [*Kansas v. Ventris*, 556 U.S. 586, 129 S.Ct. 1841, 1847 n. *, 173 L.Ed.2d 801 (2009)], and [*Dowling v. United States*, 493 U.S. 342, 353, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)].

The way to deal with unreliable evidence, the Supreme Court tells us, is via the adversary system, which includes the ability to confront witnesses, the assistance of counsel, jury instructions, the burden of proof and the right to introduce contrary evidence.  *Id*. at 728-29.  Justice Thomas concurs, noting that the *Stovall* line of cases is grounded in substantive due process, which he finds inconsistent with the strictly procedural nature of the Due Process Clause.  *See id*. at 730 (Thomas, J., concurring).

*       *       *

Criminal trials reflect the pinnacle of procedural formality because the consequences of an erroneous conviction --loss of liberty or life -- are the most serious.  The Court has been willing to protect these values by adopting quasi-substantive rules such as those announced in *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), *Brown v. Mississippi*, 297 U.S. 278, 285-86, 56 S.Ct. 461, 80 L.Ed. 682 (1936), and *Stovall*.  All of those rules were designed to counter a particular evil:  misconduct by police and prosecutors.  But the Court has steadfastly refused, even in criminal cases, to find a due process violation based on the mere unreliability of evidence.

*Angov v. Holder*, 736 F.3d 1263, 1271-72 (9th Cir.2013).

There has been no showing that the in-court identification of Browning by Josy Elsen at trial was the result of any unnecessarily suggestive procedure or circumstances arranged by law enforcement.  The Nevada Supreme Court's denial of relief on this claim was not objectively unreasonable.

27

1        The Identification of Browning by Debra Coe

2        Debra Coe worked at a business next door to the Elsens' jewelry store; she identified

3    Browning as the man she saw run by that business shortly after Hugo Elsen's murder.  Trial

4    Testimony of Debra Coe, Exhibit 46, pp. 303-17 (ECF No. 59-32, pp. 20-27, and ECF No. 59-33,

5    pp. 2-8).  Browning makes claims in his fifth amended habeas petition regarding Debra Coe's

6    identification.

7        In Claim 1, at paragraphs 5.11 through 5.11.3, and 5.14.3 and 5.14.4, Browning claims that

8    his trial counsel was ineffective for not sufficiently investigating the circumstances of Coe's

9    observations, resulting in an inadequate cross-examination, and in Claim 6, at paragraphs 5.75, and

10   5.76 through 5.76.6, Browning claims that his trial counsel was ineffective for not adequately cross-

11   examining Coe.  Fifth Amended Petition, pp. 15-16, 67-69; *see also* Reply, p. 34.[4]  Browning raised

12   these claims on the appeal in his state habeas action.  Opening Brief, Exhibit 232, pp. 48-49

13   (ECF No. 59-174, p. 34, and ECF No. 59-175, p. 2).  The Nevada Supreme Court considered the

14   adequacy of counsel's cross-examination of Coe, and ruled as follows:

15           ... Browning asserts that counsel failed to properly cross-examine and
         impeach witness Debra Coe.  Shortly after the crimes, the police brought Browning to
16       Coe to determine if he was the man she had seen jogging by her window away from
         the crime scene.  She said that Browning looked like the man but that she was not
17       positive.  At trial she stated that she was sure that the man was Browning.  She also
         initially told police that all blacks look the same; however, at trial she stated that she
18       was joking and did not think that all blacks looked the same.  Browning claims that
         counsel inadequately cross-examined Coe by failing to ask her if the man she saw had
19       any blood on him or was carrying any jewelry cases and why she thought that all
         blacks look alike.  This claim lacks merit.  Counsel unsuccessfully sought to suppress
20       Coe's identification of Browning at trial.  During cross-examination of Coe, counsel
         asked her many questions regarding her identification of Browning and whether she
21       believed that all blacks looked alike.  Browning has not demonstrated that counsel's
         cross-examination of Coe was deficient or that there is a reasonable probability of a
22       different result if counsel had asked if the man she saw was bloody or was carrying
         jewelry cases.

23

24

25

26          [4]  Browning has abandoned the claim, in Claim 1, at paragraphs 5.11 through 5.11.3, that his
     counsel was ineffective for not interviewing Coe before trial.  *See* Reply, p. 34, lines 8-10.

1   *Browning,* 120 Nev. at 357-58, 91 P.3d at 47.  Given the weight of the evidence against Browning,

2   and considering the cross-examination of Coe that counsel conducted, the court finds that the

3   Nevada Supreme Court's ruling -- that the alleged shortcomings of counsel's cross-examination of

4   Coe were not prejudicial to Browning -- was not objectively unreasonable.

5         In Claim 6, at paragraph 5.74, Browning claims that his trial counsel "did not use available

6   evidence to properly move to exclude Ms. Debra Coe's identification outside the presence of the

7   jury."  Fifth Amended Petition, p. 65.  Citing *Stovall*, Browning argues that the out-of-court showup

8   identification by Coe, shortly after Browning's arrest, was unnecessary and unduly suggestive, that

9   it tainted her in-court identification, and that counsel did not effectively convey to the trail court the

10  prejudicial circumstances demonstrating the unreliability of the identification.  Fifth Amended

11  Petition, pp. 65-66; Reply, pp. 126-29.  Counsel did seek to exclude Coe's identification of

12  Browning, but the trial court denied that motion.  *See* Motion to Suppress Identification, Exhibit 40;

13  Trial Transcript, Exhibit 46, pp. 300-01 (ECF No. 59-32, pp. 17-18).  In denying the motion, the trial

14  court noted that Browning was actually the second individual brought before Coe; Coe told the

15  police that the first individual brought before her was not the person she saw run by the business

16  where she worked.  *See* Trial Transcript, Exhibit 46, p. 301.  Browning made this claim on the

17  appeal in his state habeas action.  *See* Appellant's Reply Brief, Exhibit 251, pp. 10-11 (ECF

18  No. 59-180, pp. 19-20).  The Nevada Supreme Court denied the claim, noting that "[c]ounsel

19  unsuccessfully sought to suppress Coe's identification of Browning at trial."  *Browning,* 120 Nev.

20  at 357, 91 P.3d at 47.  The Nevada Supreme Court's denial of this claim was not objectively

21  unreasonable.  Trial counsel moved to exclude Coe's identification under *Stovall*, and the trial court

22  denied the motion.  Browning does not specify anything further that his counsel could have done

23  that would have rendered that motion successful.

24        <u>Hugo Elsen's Dying Declaration Regarding the Murderer's Hair</u>

25        Officer Branon spoke with Hugo Elsen before he died after the stabbing, and Hugo Elsen

26  gave Branon a description of the person who stabbed him.  *See* Testimony of Gregory Branon at

1    Evidentiary Hearing, Exhibit 182, pp. 158-69 (ECF No. 59-145, p. 41 - ECF No. 59-146, p. 11).

2    Browning makes claims related to the information that Hugo Elsen gave to Officer Branon.

3            In Claim 1, at paragraphs 5.13 through 5.13.4, Browning claims that his trial counsel was

4    ineffective for not interviewing Officer Branon to learn that Branon received from Hugo Elsen the

5    description of the murderer's hair, and that description did not match Browning's hair.  Fifth

6    Amended Petition, pp. 18-19.  Browning raised this claim on the appeal in his state habeas action.

7    *See* Appellant's Opening Brief, Exhibit 232, pp. 43-45 (ECF No. 59-174, pp. 29-31).  The Nevada

8    Supreme Court ruled on this claim as follows:

9                    ... Browning claims that trial counsel failed to interview several key
         witnesses, including Officer Gregory Branon, the first officer on the crime scene.
10       Officer Branon testified at trial that he received from the dying Elsen a description of
         the killer as a "black male adult in his late twenties, wearing a blue baseball cap, ...
11       and hair described as a shoulder length jeri-type curl."  But Browning's hair was not
         a jeri-curl when he was arrested a short time later.  In closing argument, the
12       prosecutor argued that it was understandable if a white person, such as the victim,
         incorrectly used the term "jeri-curl" to describe Browning's hair.  However, at the
13       evidentiary hearing, Officer Branon, who is black, testified that the term "jeri-curl"
         was his own, based on Elsen's description of the perpetrator's hair as loosely curled
14       and wet.  Browning argues that his trial counsel was ineffective in not discovering
         this information, which would have refuted the prosecutor's closing argument and
15       shown that the victim's description of the perpetrator's hair did not match
         Browning's.
16
                 We conclude that trial counsel was deficient here but that this deficiency
17       alone was not prejudicial.  The issue of Browning's hairstyle was extensively
         explored at trial.  Elsen was the only person who described the hair protruding from
18       Browning's hat as loosely curled and wet.  Mrs. Elsen stated that it simply "puffed
         out in the back" of his cap.  Coe testified that Browning's hair stuck out about an inch
19       below his cap.  The showup identification was the first time that witnesses viewed
         him without his hat.  Coe testified that at the showup she could tell that Browning had
20       just taken a cap off because his hair was matted down.  Given this evidence and the
         overall strong evidence of Browning's guilt, we conclude that there is no reasonable
21       probability of a different result if counsel had discovered and presented the evidence
         that "jeri-curl" was the officer's term, not the victim's.
22

23   *Browning,* 120 Nev. at 355-56, 91 P.3d at 46.  This ruling by the Nevada Supreme Court is

24   supported by the record, and is not objectively unreasonable.  Browning's counsel called Officer

25   Branon to testify, and he testified that the description of the murderer that he received included "a

26   shoulder length Jeri-type curl."  Trial Testimony of Gregory Branon, Exhibit 49, pp. 537-38 (ECF

No. 59-41, pp. 19-20). Branon described a jeri-curl as "chemically treated so that it is like a loose

curl," and having "a wet, shiny look." *Id.* at 538. Browning's counsel called a hairstylist to testify

regarding what is meant by "jeri-curl," and he attempted to show that a "jeri-curl" is something

different from how Browning's hair looked at the time. *See* Trial Testimony of Annie Ruth Yates,

Exhibit 49, pp. 540-42 (ECF No. 59-41, pp. 22-24). This court agrees with the Nevada Supreme

Court that trial counsel performed deficiently in not discovering, and in not showing the jury, that

Officer Branon remembered receiving from Hugo Elsen the description of the murderer's hair --

wet, shoulder length, and loosely curled, or what Branon termed a "jeri-curl" (*see* Testimony of

Gregory Branon at Evidentiary Hearing, Exhibit 182, pp. 159-61 (ECF No. 59-145, p. 42 - ECF No.

59-146, p. 3)) -- however, given the other evidence at trial regarding the murderer's hairstyle and the

meaning of "jeri-curl," including the descriptions provided by Josy Elsen, Debra Coe, and Charles

Wood, and the testimony of the hairstylist, and given the other evidence of Browning's guilt, this

court finds reasonable the Nevada Supreme Court's determination that there is no reasonable

probability that, but for this deficient performance by counsel, the result of the trial would have been

different.

In Claim 4, at paragraphs 5.44 through 5.44.2, Browning claims that the prosecution

committed a *Brady* violation by not disclosing to the defense that it was Hugo Elsen who gave

Officer Branon the description of the murderer's hair, that the description was that the murderer's

hair was wet, shoulder length and loosely curled, that Officer Branon's questioning of Hugo Elsen

about the murderer's hair was meticulous, and that Hugo Elsen did not appear confused when

providing the description. Fifth Amended Petition, pp. 41-42. Browning raised this *Brady* claim

before the Nevada Supreme Court, but only in one sentence in a footnote in a section of his opening

brief dealing with alleged ineffective assistance of counsel. *See* Appellant's Opening Brief, Exhibit

232, p. 44 n.23 (ECF No. 59-174, p. 30). The Nevada Supreme Court denied the claim, ruling that

"the State did not withhold this information because it was reasonably available to the defense."

*Browning*, 120 Nev. at 370, 91 P.3d at 55. The Court finds that the Nevada Supreme Court's ruling

in this regard was not objectively unreasonable.  Browning has made no showing that the

prosecution withheld any information from the defense about Officer Branon's memory of the

source of his characterization of the murderer's hairstyle.

Marsha Gaylord

At the time of Hugo Elsen's murder, Browning was romantically involved with a woman

named Marsha Gaylord.  Browning claims that Gaylord could have provided exculpatory testimony

on his behalf if she had been available to testify at trial.  Browning's trial counsel intended to call

Gaylord as a witness, but she was unavailable at the time of trial, and did not testify.  *See* Testimony

of Randall Pike at Evidentiary Hearing, Exhibit 181, pp. 236-38 (ECF No. 59-140, pp. 37-39).

In his fifth amended habeas petition, Browning asserts several claims involving Gaylord.

In Claim 1, at paragraph 5.15, Browning claims that his trial counsel was ineffective for

failing to ensure the presence of Gaylord at trial or preserve her testimony for trial.  Fifth Amended

Petition, pp. 20-21.  Browning raised this claim before the Nevada Supreme Court on the appeal in

his state habeas action, in a footnote in a section of his opening brief dealing with a claim that trial

counsel was ineffective for failing to have Browning testify in his own defense.  *See* Appellant's

Opening Brief, Exhibit 232, p. 57 n.30 (ECF No. 59-175, p. 10).  The Nevada Supreme Court denied

the claim without any discussion.  This court finds that the Nevada Supreme Court's denial of this

claim was not objectively unreasonable.  It appears from the evidence in the record that the reason

Gaylord was unavailable to testify at trial was that she unexpectedly left Las Vegas on March 20

or 21, 1986, and did not thereafter stay in touch with Browning and his counsel.  *See* March 21,

1986, Letter from Marsha Gaylord, Exhibit 194 in Support of Second Amended Petition (ECF No.

57-2, p. 33).  There was no showing by Browning in state court that Gaylord's unavailability was the

result of any deficient performance by Browning's counsel.

In  Claim 2, Browning makes the following claim:

> The prosecution improperly sought, and the trial court improperly granted, a
> continuance which caused the loss of Mr. Browning's primary defense witness,
> Ms. Marsha Gaylord.  The continuance was granted in violation of the procedures
> and intended protections dictated by the holdings in *Hill v. Sheriff*, 85 Nev. 234, 452

1
2
3

> P.2d 918 (Nev. 1969), *Bustos v. Sheriff*, 87 Nev. 622, 491 P.2d 1279 (Nev. 1971),
> and the Eighth Judicial District Court Rule 14 (E.D.C.R. 14).  This violation of
> Mr. Browning's state guaranteed rights denied him due process and equal protection
> in violation of his rights under the Sixth and Fourteenth Amendment.

4   Fifth Amended Petition, p. 24.  Browning claims that the prosecution requested and received a

5   continuance of the trial date, on grounds that they had made a calendaring error and that two

6   witnesses, Randall and Vanessa Wolfe, might be unavailable on the trial date as set, but did not

7   provide an affidavit, or sworn testimony, regarding the need for the continuance, as was allegedly

8   required under *Hill v. Sheriff*, 85 Nev. 234, 452 P.2d 918 (1969); *Bustos v. Sheriff*, 87 Nev. 622, 491

9   P.2d 1279 (1971); and Eighth Judicial District Court Rule 14.  *Id*. at 24-31.  Browning claims that

10  the failure of the trial court to enforce the requirement of *Hill*, *Bustos*, and Eighth Judicial District

11  Court Rule 14, violated his federal constitutional rights to due process of law and equal protection of

12  the laws.  *Id*.  Browning raised this claim -- albiet obliquely -- in the Nevada Supreme Court on the

13  appeal in his state habeas action.  *See* Appellant's Opening Brief, Exhibit 232, pp. 70-78 (ECF No.

14  59-175, pp. 23-31).  The Nevada Supreme Court denied the claim without any discussion.  *See*

15  *Browning,* 120 Nev. at 371-72, 91 P.3d at 56.  This court finds the claim to be meritless.  Browning

16  cites no authority finding a liberty interest, giving rise to a federal constitutional due process or

17  equal protection right, arising from any procedural rules like the alleged requirement of *Hill*, *Bustos*,

18  and Eighth Judicial District Court Rule 14.  Furthermore, a reading of *Hill* and *Bustos*, and the other

19  Nevada cases cited by Browning in support of the state-law requirement on which his claim is

20  grounded, reveals that none of those cases involve the continuance of the felony trial of an adult.

21  *Hill*, *Bustos*, *Clark v. Sheriff*, 94 Nev. 364, 580 P.2d 472 (1978), *Reason v. Sheriff*, 94 Nev. 300, 579

22  P.2d 781 (1978), *Streitenberger v. Sheriff*, 93 Nev. 689, 572 P.2d 931 (1977), *Salas v. Sheriff*, 91

23  Nev. 802, 543 P.2d 1343 (1975), *McNair v. Sheriff*, 89 Nev. 434, 514 P.2d 1175 (1973), *Broadhead*

24  *v. Sheriff*, 87 Nev. 219, 484 P.2d 1092 (1971), and *Maes v. Sheriff*, 86 Nev. 317, 468 P.2d 332

25  (1970), involved continuances of preliminary hearings; *Scott E. v. State*, 113 Nev. 234, 931 P.2d

26  1370 (1997), involved the continuance of a juvenile proceeding.  As for Eighth Judicial District

1    Court Rule 14, Browning has not provided the text of any such Eighth Judicial District Court Rule

2    as it appeared in 1986, and this court has been unable to determine that any such rule existed.

3    Moreover, five days after the continuance was granted, and well before the new trial date, with their

4    response to Browning's motion to dismiss on the ground of the alleged improper continuance, the

5    prosecution did submit affidavits explaining the need for the continuance, including information

6    regarding the question of the availability of the Wolfes on the vacated trial date. *See Affidavits of*

7    *Bill A. Berrett, Dan M. Seaton, and Bob Leonard*, Exhibit 15 (ECF No. 59-13, pp. 7-12).  Therefore,

8    in this court's view, Browning has not established that he had a liberty interest, giving rise to federal

9    constitutional rights, with respect to the procedure for the continuance of his trial, and, even if  he

10   could establish the existence such a liberty interest, Browning has not shown that it was violated.

11        In Claim 3, Browning claims a violation of his rights under the Sixth Amendment, as

12   follows:

13        The prosecution, in bad faith, improperly sought a continuance of
          Mr. Browning's trial by a ruse.  The trial court improperly granted the prosecution's
14        request, over defense objection.  A key defense witness was available and willing to
          testify at the trial; however, because of the improper continuance the witness became
15        unavailable, denying Mr. Browning his right to compel witnesses and present
          evidence at trial, guaranteed by the Sixth and Fourteenth Amendments.
16

17   Fifth Amended Petition, p. 32.  The court construes this as a claim of violation of Browning's Sixth

18   Amendment right to a speedy trial.  *See* Order entered April 5, 2013 (ECF No. 162), p. 13; *see also*

19   Reply, p. 65.  Browning raised this claim on his direct appeal.  *See* Appellant's Opening Brief,

20   Exhibit 84, pp. 8-14 (ECF No. 59-59, p. 15 - ECF No. 59-60, p. 2); Appellant's Supplemental

21   Opening Brief, Exhibit 87, pp. 1-10 (ECF No. 59-61, pp. 10-20).  The Nevada Supreme Court ruled

22   as follows:

23        On appeal, Browning contends that by delaying his trial twenty-eight days,
          the district court violated his constitutional right to a speedy trial.  We disagree.
24
          Although Browning promptly invoked his right to a speedy trial, under the
25        circumstances of this case, the mere twenty-eight day delay is insufficient to justify
          dismissal of the charges against him.  Due to the severity of the crimes charged, we
26        will tolerate a longer delay than we might for a crime of less egregious proportions.
          *See  Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).  In

1    addition, the reasons underlying the delay do not justify Browning's release; namely,
     the deputy district attorney's honest, but negligent, mistake in transcribing the
2    appropriate trial date and the professed inability to locate key prosecution witnesses
     prior to trial do not reveal an improper motive by the state in requesting the delay.
3    Thus, this is not a case involving a deliberate attempt to delay trial in order to hamper
     the defense, and therefore we need not be so concerned with policing the state's
4    activity. *See Barker*, 407 U.S. at 531, 92 S.Ct. at 2192.  Moreover, Browning has not
     reasonably identified how the twenty-eight day delay has prejudiced his defense.  In
5    light of the overwhelming evidence of guilt presented against him at trial, it is clear
     that any alleged prejudice would not rise to the level justifying dismissal of the
6    charged crimes.

7    *Browning,* 104 Nev. at 271, 757 P.2d at 352.  This court affords this ruling by the Nevada Supreme

8    Court the deference mandated by 28 U.S.C. § 2254(d), and finds it to be reasonable.  Browning

9    concedes that the Nevada Supreme Court applied the correct United States Supreme Court

10   precedent, *Barker v. Wingo,* 407 U.S. 514 (1972), but argues that the court unreasonably applied

11   *Barker.  See* Reply, pp. 65-68.  In *Barker*, the Court explained that in addressing a claimed violation

12   of the Sixth Amendment right to a speedy trial, courts are to apply a balancing test, and the Court

13   identified four factors to be considered:  (1) the length of the delay, (2) the reason for the delay,

14   (3) the defendant's assertion of the right, and (4) prejudice to the defendant.  *Barker*, 407 U.S. at

15   530.  The Barker Court explained further:

16        We regard none of the four factors identified above as either a necessary or sufficient
          condition to the finding of a deprivation of the right of speedy trial.  Rather, they are
17        related factors and must be considered together with such other circumstances as may
          be relevant.  In sum, these factors have no talismanic qualities; courts must still
18        engage in a difficult and sensitive balancing process.

19   *Barker*, 407 U.S. at 533.

20        Asserting that "there is no 'severity of the crime' prong in the *Barker* test," Browning argues

21   that the Nevada Supreme Court erroneously considered the severity of the crime in this case. *See*

22   Reply, p. 66.  That argument is meritless.  While it is true that there is no separate "severity of the

23   crime prong" in the *Barker* test, the Court in *Barker* made clear that the severity of the crime is to be

24   taken into consideration with respect to the length of the delay.  *See Barker*, 407 U.S. at 531

25   ("[B]ecause of the imprecision of the right to speedy trial, the length of delay that will provoke such

26   an inquiry is necessarily dependent upon the peculiar circumstances of the case.  To take but one

35

1  example, the delay that can be tolerated for an ordinary street crime is considerably less than for a

2  serious, complex conspiracy charge."); *see also United States v. Tanh Huu Lam*, 251 F.3d 852, 856-

3  57 (9th Cir.2001).  In this case, the delay -- 28 days -- was relatively short considering the severity

4  of the crime -- capital first-degree murder.

5      Browning also takes issue with the Nevada Supreme Court's findings regarding the reason

6  for the delay:

7          In addition, the reasons underlying the delay do not justify Browning's release;
           namely, the deputy district attorney's honest, but negligent, mistake in transcribing
8          the appropriate trial date and the professed inability to locate key prosecution
           witnesses prior to trial do not reveal an improper motive by the state in requesting the
9          delay.  Thus, this is not a case involving a deliberate attempt to delay trial in order to
           hamper the defense, and therefore we need not be so concerned with policing the
10         state's activity.

11  *Browning,* 104 Nev. at 271, 757 P.2d at 352.  Browning has not, however, shown those findings to

12  be unreasonable in light of the evidence.  *See*, *e.g.*, Affidavits of Bill A. Berrett, Dan M. Seaton, and

13  Bob Leonard, Exhibit 15 (ECF No. 59-13, pp. 7-12).

14      Finally, Browning argues that the Nevada Supreme Court, in ruling that "Browning has not

15  reasonably identified how the twenty-eight day delay has prejudiced his defense," did not give

16  adequate weight to the prejudice that he claims as a result of the delay.  Browning claims that he lost

17  Marsha Gaylord as a witness as a result of the delay, and she would have provided exonerating

18  testimony if she had been available.  *See* Reply, pp. 67-68.  However, while the claimed prejudice to

19  the defense is a factor to be considered, it is not controlling.  *See Barker*, 407 U.S. at 533.  And,

20  moreover, while Browning and his trial counsel have stated what they claim Gaylord's testimony

21  would be, Gaylord did not, in any post-trial proceeding, testify, or otherwise provide any indication

22  how she would testify.

23      In sum, this Court finds that the Nevada Supreme Court's application of the *Barker* test, and

24  its denial of the claim Browning asserts in Claim 3, was not objectively unreasonable.

25      In Claim 6, at paragraphs 5.72 through 5.72.3, Browning claims that his trial counsel was

26  ineffective for failing to object, or request a curative jury instruction, with respect to statements in

1   the prosecutor's rebuttal closing argument regarding the defense's failure to put Marsha Gaylord on

2   the stand to testify.  Fifth Amended Petition, pp. 62-63; *see also* Order entered April 5, 2013 (ECF

3   No. 162) (regarding the court's construction of this claim); Reply, p. 118.  Specifically, Browning

4   claims that his counsel should have objected, or requested a curative jury instruction, regarding the

5   following argument, made by the prosecutor in his rebuttal closing argument:

6       And I think it just points out a typical weakness of the defense's position in a very
        weak case, and this is that is Marcia in jail, Mr. Pike wants to know, and why didn't I
7       bring in jail records.  I don't have to bring in jail records.  I had testimony that she
        was in jail.

8
        Randy Wolfe said that Marcia Gaylord was in jail.  Randy Pike subpoenaed a
9       police officer.  He has the capability.... He has the capability of subpoenaing anyone
        he wants to.  He could bring in those jail records.  He could bring in Marcia Gaylord.
10      Sure not my witness.  Sure wasn't here to testify in this particular trial.

11  Trial Transcript, Exhibit 51, pp. 648-49 (ECF No. 59-47, pp. 5-6).  Browning raised this claim on

12  the appeal in his state habeas action.  *See* Appellant's Opening Brief, Exhibit 232, p. 56 (ECF No.

13  59-175, p. 9).  The Nevada Supreme Court ruled as follows:

14      Browning contends that counsel should have objected to the prosecutor's
        comments on the defense's failure to call Browning's girlfriend Gaylord as a witness.
15      (He also claims that trial counsel should have requested a missing witness jury
        instruction, but provides no authority.)  During closing argument, trial counsel stated,
16      "I recall no testimony by a custodian of records or anyone from the Clark County
        Detention Center that Marcia Gaylord was in custody."  The prosecutor responded in
17      rebuttal that Randy Wolfe had testified that Gaylord was in jail and that defense
        counsel "has the capability of subpoenaing anyone he wants to.  He could bring in
18      those jail records.  He could bring in Marcia Gaylord. Sure not my witness.  Sure
        wasn't here to testify in this particular trial."  This response went too far because the
19      defense had tried to subpoena Gaylord, but after a continuance of the trial due to the
        prosecutor's calendaring mistake, the defense could not locate Gaylord.  Here, the
20      prosecutor should have responded by simply stating that he did not need to produce
        the jail records because a witness had testified that Gaylord was in jail.  It was
21      improper for him to point out that the defense had not called Gaylord.  Generally, a
        prosecutor's comment on the defense's failure to call a witness impermissibly shifts
22      the burden of proof to the defense.  [Footnote: *See Whitney v. State*, 112 Nev. 499,
        502, 915 P.2d 881, 882-83 (1996).]  However, as discussed above, the issue of
23      exactly when Gaylord was released from jail was not significant, and we conclude
        that counsel's failure to object to the prosecutor's comment was not prejudicial.

24

25  *Browning,* 120 Nev. at 359-60, 91 P.3d at 48-49.  This court agrees with the state supreme court that

26  the question of exactly when Gaylord was released from jail was not of major significance in the

trial, and it was regarding that factual question that this argument was made.  The court finds that the Nevada Supreme Court's ruling -- that Browning was not prejudiced as required under *Strickland* -- was not objectively unreasonable.

In Claim 5, at paragraph 5.62, Browning makes the related substantive claim: that the prosecutor committed misconduct, and shifted the burden of proof to the defense, when he commented upon the defense's failure to put Gaylord on the stand at trial.  Fifth Amended Petition, p. 54.  Browning raised this claim on the appeal in his state habeas proceeding.  *See* Appellant's Opening Brief, Exhibit 232, pp. 15, 33-34 (ECF No. 59-173, p. 32, and ECF No. 59-174, pp. 19-20).  The Nevada Supreme Court found the claim to be procedurally barred.  *See Browning,* 120 Nev. at 368, 91 P.3d at 54  ("Browning claims the prosecutor committed misconduct in several ways.  Browning does not demonstrate good cause for failing to raise these issues on direct appeal or actual prejudice.").

In *Coleman v. Thompson*, the Supreme Court held that a state prisoner who fails to comply with the state's procedural requirements in presenting his claims is barred from obtaining a writ of habeas corpus in federal court by the adequate and independent state ground doctrine.  *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance.").  Where such a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it.  *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule.  *Murray*, 477 U.S. at 488.  For cause to exist, the external impediment must have prevented the petitioner from raising the claim.  *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

1   With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the

2   errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and

3   substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension."

4   *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989), *citing United States v. Frady*, 456 U.S. 152, 170

5   (1982).

6          With respect to this claim, Browning asserts, as cause for his procedural default, ineffective

7   assistance of his appellate counsel, for not raising the claim on direct appeal.  *See* Reply, pp. 104-05.

8   However, even if Browning could show cause for this procedural default, there is no showing of

9   prejudice.  The prosecution's offending comments regarding the failure of the defense to put

10  Gaylord on the stand were made in the context of argument regarding whether or not Gaylord was in

11  jail on the day of Hugo Elsen's murder.  Again, this court agrees with the state supreme court that

12  the question of exactly when Gaylord was or was not in jail was not of any great significance in the

13  trial.  The court, therefore, finds this claim, at ¶5.62 of Browning's fifth amended petition, to be

14  barred by the procedural default doctrine.  The court finds that there is no showing of any possibility

15  that the constitutional violation alleged in this claim "resulted in the conviction of one who is

16  actually innocent" (*see Murray*, 477 U.S. at 496), and the court determines that an evidentiary

17  hearing is not warranted with respect to the procedural default of this claim.  *See* Petitioner's Motion

18  for Evidentiary Hearing (ECF No. 135).

19         In Claim 6, at paragraph 5.83, Browning claims that his trial counsel was ineffective for

20  failing to object to comments made by the prosecutor, unsupported by evidence, that Gaylord was a

21  prostitute, that Browning needed money to get her out of jail so she could make money, and that this

22  was a motive for the robbery and murder of Hugo Elsen.  Fifth Amended Petition, p. 73.  Browning

23  asserted this claim on the appeal in his state habeas action.  *See* Appellant's Opening Brief, Exhibit

24  232, pp. 56 (ECF No. 59-175, p. 9).  The Nevada Supreme Court ruled as follows:

25         ... Browning claims that trial counsel should have objected during closing argument
           when the prosecutor referred to Browning's involvement with drug use and said that
26         his "girlfriend prostituted for him."  Randy Wolfe had testified that Browning asked
           Wolfe to "cop" him some heroin.  Wolfe also commented on Gaylord's involvement

39

in prostitution; however, trial counsel objected, and the district court struck the statement. Therefore, although the prosecutor's comment on Browning's drug use was based on a fact in evidence, there was no evidence that Browning was involved in the crime of pimping or pandering prostitution. Such an improper reference to criminal history may violate due process, and counsel should have objected. [Footnote: *See Manning v. Warden*, 99 Nev. 82, 86-87, 659 P.2d 847, 850 (1983).] Nevertheless, we conclude that given the extensive evidence of Browning's guilt, this reference alone was not prejudicial.

*Browning,* 120 Nev. at 358, 91 P.3d at 47-48. The statements regarding Gaylord being a prostitute were made by the prosecution to show that Browning needed money to get her out of jail, so that she could make money, but this court finds Browning's specific reason for needing money to have been of little importance. The court finds that the state supreme court's ruling -- that there is no reasonable probability that, but for counsel's failure to object to the prosecution's comments about Gaylord being a prostitute, the result of the trial would have been different -- was not objectively unreasonable.

In Claim 5, at paragraph 5.65, Browning makes the related substantive claim: that the prosecution committed misconduct by making comments, unsupported by evidence, that Gaylord was a prostitute. Fifth Amended Petition, p. 56. Browning raised this claim on the appeal in his state habeas action. *See* Appellant's Opening Brief, Exhibit 232, pp. 35-38 (ECF No. 59-174, pp. 21-24). The claim, however, is barred by the doctrine of procedural default. Browning argues that this claim was raised and decided on his direct appeal, but the court finds that was not the case; the claim raised there was not the same. *See* Reply, p. 108; *see also* Appellant's Opening Brief, Exhibit 84, pp. 19-20 (ECF 59-60, pp. 7-8). On the appeal in the Browning's state habeas action, where Browning did raise this claim, the Nevada Supreme Court held the claim to be procedurally barred. *See Browning,* 120 Nev. at 368, 91 P.3d at 54. This claim, at paragraph 5.65 of Browning's fifth amended petition, is barred by the procedural default doctrine. The court finds that there is no showing of any possibility that the constitutional violation alleged in this claim "resulted in the conviction of one who is actually innocent" (*see Murray*, 477 U.S. at 496), and the court determines

1   that an evidentiary hearing is not warranted with respect to the procedural default of this claim.

2   *See* Petitioner's Motion for Evidentiary Hearing (ECF No. 135).

3        <u>Thomas Stamps</u>

4        In Claim 1, at paragraphs 5.16 through 5.16.4, Browning claims that his trial counsel was

5   ineffective for failing to secure the presence of Thomas Stamps at trial to testify for the defense.

6   Fifth Amended Petition, p. 21.  Browning alleges that Stamps "went with Randall Wolfe and Mike

7   Hines to a gold exchange shortly after Mr. Elsen's murder, where Randall Wolfe used someone

8   else's identification to sell the jewelry." *Id*.  Browning raised this claim in his state habeas action.

9   In that case, the state district court ruled as follows:

10      Defendant asserts that Mr. Pike failed to ensure the presence of several key defense
    witnesses.  There was no evidence adduced at the evidentiary hearing or in the record

11      to determine what the testimony of any of these witnesses would have been.
    Therefore, Defendant has not, as a matter of law, shouldered his burden to put forth

12      evidence to support his allegations.  Therefore, his allegation is bare and naked,
    unsupported by anything in the record.  As such, this Court must deny relief.

13

14  Findings of Fact, Conclusions of Law and Order, Exhibit 230, p. 5 (ECR No. 59-171, p. 7).

15  Browning then raised this claim on the appeal in that action.  *See* Appellant's Opening Brief,

16  Exhibit 232, pp. 42-43 n.22, and pp. 47-48 (ECF No. 59-174, pp. 28-29, 33-34).  The Nevada

17  Supreme Court denied the claim without any discussion.  The court finds the Nevada Supreme

18  Court's rejection of this claim to be reasonable; Browning did not offer any evidence in state court

19  to show how Stamps would have testified.  Any attempt by Browning now, in federal court, to offer

20  such evidence, is foreclosed by *Cullen v. Pinholster*, ___U.S.___, 131 S.Ct. 1388, 1398, 179

21  L.Ed.2d 557 (2011) (federal habeas review limited to record before the state court that adjudicated

22  the claim on the merits).

23       <u>The Escape</u>

24       At trial, there was evidence that, after he was arrested and taken to an interrogation room at a

25  police station, Browning picked a lock on his handcuffs and escaped from custody. *See* Testimony

26  of David Radcliffe, Exhibit 48, pp. 350-57  (ECF No. 59-35, pp. 14-21); Testimony of Michael K.

41

1   Bunker, Exhibit 49, pp. 568-71 (ECF No 59-42, pp. 24-27).  The prosecution argued that

2   Browning's escape showed consciousness of guilt.  Trial Transcript, Exhibit 51, p. 631 (ECF No.

3   59-46, p. 10).

4        In Claim 1, at paragraph 5.19, Browning claims that his trial counsel was ineffective for not

5   investigating the facts of the escape, and learning "that when Mr. Browning was taken to the police

6   station, he was placed shirtless in a room where he was handcuffed to a metal pole, under an air-

7   conditioned vent, and left for several hours."  Fifth Amended Petition, p. 23.  Browning raised this

8   claim on the appeal in his state habeas action.  *See* Appellant's Opening Brief, Exhibit 232, pp. 59-

9   60 (ECF No. 59-175, pp. 12-13).  the Nevada Supreme Court ruled as follows:

10         Browning contends that trial counsel should have presented a defense of
    duress to the charge of escape.  He claims that he was under duress immediately after

11   he was arrested because of a police officer's threatening comments and cold
    conditions in the interrogation room.  Apparently, Browning was shirtless and

12   handcuffed to a pole below an air conditioning vent, and an officer allegedly told him
    that "when you are busted for murder in Nevada the case is closed."  Browning

13   picked the lock on his handcuffs, left the third-floor room, and proceeded downstairs
    to the door leading outside, where he was caught.  Under NRS 194.010(7), duress

14   requires a reasonable belief that one's life would be endangered or that one would
    suffer great bodily harm.  The air conditioning and the officer's alleged comment do

15   not constitute cause for such a belief.  Moreover, this court has held that duress is not
    applicable to an escape charge; rather the proper defense is one of necessity, which

16   requires the following five conditions: the prisoner is faced with a specific, imminent
    threat of death, forcible sexual attack, or substantial bodily injury; there is no time to

17   complain to authorities, or there is a history that such complaints are futile; there is
    no time or opportunity to resort to the courts; no force or violence is used toward

18   prison personnel or innocent persons during the escape; and the prisoner immediately
    reports to the proper authorities after obtaining a position of safety.  [Footnote:

19   *Jorgensen v. State*, 100 Nev. 541, 543-44, 688 P.2d 308, 309-10 (1984).]  The facts
    here also do not support a necessity defense, and counsel reasonably presented

20   neither defense.

21   *Browning,* 120 Nev. at 361, 91 P.3d at 49-50.  This court agrees with the Nevada Supreme Court

22   that there is no reasonable probability that, but for counsel's failure to investigate the circumstances

23   of Browning's escape, the result of the trial would have been different.  As the Nevada Supreme

24   Court explained, applying state law, the facts did not support either a necessity or duress defense to

25   the escape charge.  Moreover, in this court's view, establishing before the jury that, where he was

26   handcuffed in the interrogation room, Browning was without a shirt and under an air conditioning

1   vent, would have done nothing to ameliorate the consciousness of guilt arguably exhibited by

2   Browning's escape.  In short, this court finds this claim to be without merit.  The Nevada Supreme

3   Court's ruling on the claim was not objectively unreasonable.

4           The Photograph of Browning from the Photographic Line-Up -- Prior Criminal Activity

5           Browning claims that the prosecution committed misconduct with respect to the prosecutor's

6   argument concerning a photograph of Browning that had been part of a photographic line-up and

7   that was admitted into evidence at trial.  *See* Fifth Amended Petition, pp. 54-55.  According to

8   Browning, "[t]he prosecution used the out-dated photograph to argue that Mr. Browning had

9   engaged in prior criminal activity," and "[t]his argument was improper since it permitted the jury to

10  consider prior criminal activity as propensity to convict Mr. Browning."  *Id*.

11          In Claim 6, at paragraph 5.79, Browning claims that his trial counsel was ineffective for not

12  objecting to the argument of the prosecutor regarding the photograph, and for not seeking a curative

13  jury instruction.  Fifth Amended Petition, p. 71.  Browning raised a similar claim on the appeal in

14  his state-court habeas action.  *See* Appellant's Opening Brief, Exhibit 232, pp. 49-50 (ECF No. 59-

15  175, pp. 2-3).  The Nevada Supreme Court ruled as follows:

16          ... Browning claims that counsel should have objected to admission of a mug shot,
            which allowed the jury to infer that Browning had been involved in prior criminal
17          activity.  We conclude that the photo had no appreciable prejudicial effect since
            jurors had no reason to assume that it had been taken in any other case but the one for
18          which Browning was being tried.

19  *Browning,* 120 Nev. at 358, 91 P.3d at 47.  This court agrees that, in light of the nature of this

20  photograph, and in light of the evidence at trial, the jury was unlikely to draw from the photograph

21  any inference that Browning had been involved in prior criminal activity, such as would

22  significantly affect their view of the case.  The court finds that there is no reasonable probability

23  that, but for counsel's failure to object to the prosecution's argument regarding the photograph, or

24  his failure to request a curative jury instruction, the result of the trial would have been different.

25  The Nevada Supreme Court's denial of this claim was not objectively unreasonable.

26

1    In Claim 5, at paragraph 5.63, Browning makes the substantive claim that the prosecutor

2  committed misconduct with respect to his argument concerning the photograph.  Fifth Amended

3  Petition, pp. 54-55.  Browning raised this claim on the appeal in his state habeas action.  *See*

4  Appellant's Opening Brief, Exhibit 232, p. 37 (ECF No. 59-174, p. 23).  The Nevada Supreme Court

5  held the claim to be procedurally barred.  *See Browning,* 120 Nev. at 368, 91 P.3d at 54.  This claim,

6  at  paragraph 5.63 of Browning's fifth amended petition, is therefore barred by the procedural

7  default doctrine.  The court finds that there is no showing of any possibility that the constitutional

8  violation alleged in this claim "resulted in the conviction of one who is actually innocent" (*see*

9  *Murray*, 477 U.S. at 496), and the court determines that an evidentiary hearing is not warranted with

10  respect to the procedural default of this claim.  *See* Petitioner's Motion for Evidentiary Hearing

11  (ECF No. 135).

12    Browning's Heroin Use

13    There was evidence presented at trial indicating that Browning used heroin, and the

14  prosecutor made comments in his closing arguments regarding Browning's heroin use.

15    In Claim 4, at paragraph 5.56, Browning makes claims under *Brady* and *Napue*, as follows:

16    The prosecutor knew that upon being arrested, an officer with the Las Vegas Police
      Department obtained Mr. Browning's urine in order to analyze it for narcotics.  The
17    prosecutor further knew that the urine was submitted to Las Vegas Police Department
      Crime Lab for analysis, and that the results conclusively established that the had no
18    heroin in his system.  [Exh. 180]  Arguing that Mr. Browning was a heroin addict
      who committed murder to feed his addiction was unsupported by the evidence and
19    contrary to the facts known to the prosecutor.  Had the prosecutor not been permitted
      to make assertions he knew to be false, the jury would have likely acquitted
20    Mr. Browning.

21  Fifth Amended Petition, p. 50.

22    To the extent this claim is framed as a *Brady* claim it fails because Browning makes no

23  allegation -- and made no showing in state court -- that the prosecution withheld any information

24  from the defense with respect to the question of Browning's heroin use.

25    To the extent that this claim is framed as a *Napue* claim, the claim is barred by the doctrine

26  of procedural default.  Browning raised this claim on the appeal in his state habeas action (*see*

44

1    Appellant's Opening Brief, Exhibit 232, pp. 35-38 (ECF No. 59-174, pp. 21-24), but the Nevada

2    Supreme Court held the claim to be procedurally barred. *See Browning,* 120 Nev. at 368, 91 P.3d at

3    54. The court finds that there is no showing of any possibility that the constitutional violation

4    alleged in this claim "resulted in the conviction of one who is actually innocent" (*see Murray*, 477

5    U.S. at 496), and the court determines that an evidentiary hearing is not warranted with respect to

6    the procedural default of this claim. *See* Petitioner's Motion for Evidentiary Hearing (ECF No.

7    135).

8         In Claim 6, at paragraph 5.70, Browning claims that his trial counsel was ineffective for

9    failing to object "when the prosecutor repeatedly told the jury that Mr. Browning was a heroin

10   addict, that he needed 'drugs that his body craved,' had been doing drugs that day of the incident,

11   and that he committed the homicide because of, and for, heroin." Fifth Amended Petition, p. 60.

12   Browning raised this claim on the appeal in his state habeas action. *See* Appellant's Opening Brief,

13   Exhibit 232, p. 56 (ECF No. 59-175, p. 9). The Nevada Supreme Court ruled that, because "Randy

14   Wolfe had testified that Browning asked Wolfe to 'cop' him some heroin," "the prosecutor's

15   comment on Browning's drug use was based on a fact in evidence," and was therefore proper, and

16   counsel was not ineffective for not objecting. *Browning,* 120 Nev. at 358, 91 P.3d at 47. That ruling

17   by the Nevada Supreme Court is not objectively unreasonable.

18   <u>Alleged Improper Arguments by the Prosecutor</u>

19        In Claim 5, at paragraph 5.61, Browning makes the following claim:

20        During its closing argument, the prosecutor made an analogy between
     Mr. Browning and the Ray Bradbury novel "Something Wicked This Way Comes."

21   He then went on to describe the crime by referring to the "Friday the 13th" horror
     movies: "And there was probably wild stabbing going on, a hacking, a Friday the

22   13th kind of scenario." TT 12/12/86, pg. 616. The prosecutor's personal attacks
     were compounded by the repeated and unfounded assertions that Mr. Browning was a

23   heroin addict who liked killing, and "shot the life of Hugo Elsen right up his arm."
     TT 12/12/86, pg. 603. These arguments were improper, prejudicial and misconduct.

24

25

26

1    Fifth Amended Petition, pp. 53-54.  Browing made these arguments on his direct appeal.  *See*

2    Appellant's Opening Brief, Exhibit 84, pp. 18, 20-23 (ECF No. 59-60, pp. 6, 8-11.  The Nevada

3    Supreme Court denied relief, and commented on one of the challenged arguments as follows:

> During closing argument the state recounted the stabbing episode according to its
> view of the evidence.  The prosecutor became overly-animated, saying, "And there
> was probably wild stabbing going on, a hacking, a Friday-the-13th kind of scenario."
> Reference to the horror flick "Friday-the-13th" served no purpose other than to divert
> the jury's attention from its sworn task.  However, in light of the overwhelming
> evidence presented at the guilt phase of the trial, we cannot find the quantum of
> prejudice required to reverse.

8    *Browning,* 104 Nev. at 272, 757 P.2d at 353.

9        It is clearly established federal law within the meaning of § 2254(d)(1) that a prosecutor's

10   improper remarks violate the Constitution only if they so infect the trial with unfairness as to make

11   the resulting conviction a denial of due process.  *Parker v. Matthews*, ___ U.S. ___, 132 S.Ct. 2148,

12   2153, 183 L.Ed.2d 32 (2012) (per curiam); *see also Darden v. Wainwright*, 477 U.S. 168, 181

13   (1986); *Comer v. Schriro*, 480 F.3d 960, 988 (9th Cir.2007).  The ultimate question is whether the

14   alleged misconduct rendered the petitioner's trial fundamentally unfair.  *Darden,* 477 U.S. at 183.

15   In determining whether a prosecutor's argument rendered a trial fundamentally unfair, a court must

16   judge the remarks in the context of the entire proceeding to determine whether the argument

17   influenced the jury's decision.  *Boyde v. California*, 494 U.S. 370, 385 (1990); *Darden*, 477 U.S. at

18   179-82.   In considering the effect of improper prosecutorial argument, the court considers whether

19   the trial court instructed the jury that its decision is to be based solely upon the evidence, whether

20   the trial court instructed that counsel's remarks are not evidence, whether the defense objected,

21   whether the comments were "invited" by the defense, and whether there was overwhelming

22   evidence of guilt.  *See Darden*, 477 U.S. at 182.  The *Darden* standard is general, leaving courts

23   leeway in reaching outcomes in case-by-case determinations.  *Parker*, 132 S.Ct. at 2155 (*quoting*

24   *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In a federal habeas corpus action, to grant

25   habeas relief, the court must conclude that the state court's rejection of the prosecutorial misconduct

26   claim was objectively unreasonable, that is, that it "was so lacking in justification that there was an

1    error well understood and comprehended in existing law beyond any possibility for fairminded

2    disagreement." *Parker*, 132 S.Ct. at 2155 (*quoting Harrington v. Richter*, 131 S.Ct. at 767-87).

3           Applying these standards, the court finds that the ruling by the Nevada Supreme Court, and

4    its denial of relief on the claims asserted by Browning in paragraph 5.61 of his fifth amended

5    petition, was not objectively unreasonable.

6           In Claim 5, at paragraph 5.64, Browning claims:

7           The prosecutor also told the jury:

8           There is only one person responsible for that.  And it is your duty to
            go out, decide that and come back in here and tell him just exactly
9           that, that he's the one that has to pay for these crimes.  Thank you very
            much.
10
11          TT 12/12/86, pg. 631.  And the prosecutor argued:  "Think here we are in this nice
            courtroom; it is quiet in here.  It is safe in here.  Everyone is under control.  Everyone
            behaves, does whatever the Judge tells them to do.  We are not at 520 Las Vegas
12          Boulevard South on November the 8th, 1985."  TT 12/12/86, p. 614-615.  He
            continued:
13
14          ... and she sees the man leaning over her husband with a knife in his
            hand who takes his life away from her.  He ruined her life.  And she
            came in here and you saw her demeanor on the stand.  That's part of
15          your role is to watch these people who testify up here... Will she ever
            forget the face of the man who took her husband away from her?  I
16          think not.

17                                            *    *    *

18          That's why Mrs. Elsen's recognition is so valuable in this case.  She
            has a reason to never ever to forget the face of that man.
19
20          TT 12/12/86, p. 623, 654.  These arguments are improper because they tell the jury
            it's their "duty" to convict, requests the jury to put themselves in the place of the
            victim, and invokes passion from the jury by way of victim impact evidence.
21

22   Fifth Amended Petition, p. 55.

23          To the extent that, in this claim, Browning claims that the prosecution committed misconduct

24   by requesting the jury to put themselves in the place of the victim, this claim was raised by

25   Browning on his direct appeal.  *See* Appellant's Opening Brief, Exhibit 84, p. 22 (ECF No. 59-60,

26   p. 10).  The Nevada Supreme Court denied that claim on the direct appeal without comment.  This

1  court finds that the state supreme court's denial of the claim was not objectively unreasonable -- in

2  light of the evidence at trial, this argument by the prosecution did not render Browning's trial

3  fundamentally unfair.

4    To the extent that, in this claim, Browning claims that the prosecution improperly told the

5  jurors that it was their duty to convict, Browning raised that claim before the Nevada Supreme Court

6  on the appeal in his state habeas action.  *See* Appellant's Opening Brief, Exhibit 232, pp. 34-35

7  (ECF No. 59-173, 59-174, 59-175).  The Nevada Supreme Court held the claim to be procedurally

8  barred.  *See Browning,* 120 Nev. at 368, 91 P.3d at 54.  That part of the claim, then, is barred by the

9  doctrine of procedural default.  The court finds that there is no showing of any possibility that the

10 constitutional violation alleged in this part of the claim "resulted in the conviction of one who is

11 actually innocent" (*see Murray*, 477 U.S. at 496), and the court determines that an evidentiary

12 hearing is not warranted with respect to the procedural default of this part of the claim.  *See*

13 Petitioner's Motion for Evidentiary Hearing (ECF No. 135).

14   In Ground 6, at paragraph 5.80, Browning claims that his trial counsel was ineffective for

15 failing to object, or request a curative jury instruction, with regard to the prosecutor's arguments to

16 the effect that it was the jury's duty to convict Browning.  Fifth Amended Petition, p. 71.  Browning

17 raised this claim -- in one sentence in his opening brief -- on the appeal in his state habeas action.

18 *See* Appellant's Opening Brief, Exhibit 232, p. 55 (ECF No. 59-175, p. 8).  The Nevada Supreme

19 Court denied the claim without discussion.  This court finds that there is no reasonable probability

20 that, but for counsel's failure to object to the prosecution's comments, or request a curative jury

21 instruction, the result of the trial would have been different.  The Nevada Supreme Court's denial of

22 this claim was not objectively unreasonable.

23   <u>The Photograph of Hugo Elsen with a Child</u>

24   In Ground 6, at paragraph 5.81, Browning makes the following claim:

25    Mr. Pike permitted the prosecutor to introduce and the jury to consider
   improper victim impact evidence during the guilt phase when a photograph of the
26    victim with a young child sitting on his lap was admitted and the prosecutor argued
   that Mr. Browning ruined the life of "poor Mrs. Elsen."  TT 12/09/86, pgs. 258; TT

48

1    12/12/86, pgs. 623, 654.  A lawyer acting in compliance with prevailing professional
     norms would have objected to the introduction of the photograph since it lacked
2    probative value (victim's identification had been stipulated to) and was inflammatory
     and prejudicial.  Effective counsel would have objected or requested a curative
3    instruction to the prosecutor's argument.  As a result, the jury was permitted to
     consider prejudicial information in determining whether the prosecution proved its
4    case beyond a reasonable doubt.

5    Fifth Amended Petition, p. 72.  Browning raised this claim on the appeal in his state habeas action.

6    *See* Appellant's Opening Brief, Exhibit 232, p. 56 (ECF No. 59-175, p. 9).  The Nevada Supreme

7    Court ruled as follows:

8        Browning complains that counsel failed to object during the guilt phase to the
         prosecutor's use of a photo of Elsen, the victim, with a small child on his lap.
9        Browning contends that this picture amounted to victim impact evidence and was
         therefore improper during the guilt phase.  He has provided no authority to support
10       this contention, and we discern nothing prejudicial or inflammatory about the photo.
         It was reasonable for counsel not to object.

11

12   *Browning,* 120 Nev. at 360, 91 P.3d at 49.  The ruling by the Nevada Supreme Court demonstrates

13   that an objection by counsel to the admission of the photograph on the state-law grounds asserted in

14   state court -- that there was "no proper reason for the admission of the photo because the defense

15   had previously stipulated to Mr. Elsen's identity," that "[t]he photo was inflammatory and

16   prejudicial to the defense," and that the prosecution's "use of the photo was misconduct" (*see*

17   Appellant's Opening Brief, Exhibit 232, p. 56 (ECF No. 59-175, p. 9)) -- would have been for

18   naught.  The Nevada Supreme Court's ruling that it was reasonable for counsel not to object to the

19   admission of the photograph was not objectively unreasonable.

20           The Prosecutor's Comments About the Presumption of Innocence

21           In his closing argument at Browning's trial, the prosecutor made the following comments:

22           Now we are talking about when that wonderful constitutional element called
         the presumption of innocence, we are now talking about piercing that veil, dropping
23       that facade because, in fact, as a person sits in a courtroom he may not be innocent.
         He may be guilty.

24           He has the presumption of innocence.  And, of course, it is one when his guilt
25       is shown that the farce of that presumption is known and it's been done in this case.

26   Trial Transcript, Exhibit 51, p. 602 (ECF No. 59-45, p. 5).

49

1   In Claim 5, at paragraph 5.59, Browning claims that these comments by the prosecutor, in

2   closing argument, violated his "constitutional guarantees of a fair trial and due process."  Fifth

3   Amended Petition, p. 52.  Browning raised this claim on his direct appeal.  *See* Appellant's Opening

4   Brief, Exhibit 84, p. 20 (ECF No. 59-60, p. 8).  The Nevada Supreme Court ruled as follows:

5           We also denounce the state's reference to the "presumption of innocence" as a
        farce.  The fundamental and elemental concept of presuming the defendant innocent
6       until proven guilty is solidly founded in our system of justice and is never a farce.
        Even this outrageous but unpreserved act of misconduct, however, does not prejudice
7       Browning to the extent justifying reversal.

8   *Browning,* 104 Nev. at 272 n.1, 757 P.2d at 353 n.1.  This court agrees with the Nevada Supreme

9   Court, with respect to this claim.  The comments of the prosecutor were improper; the presumption

10  of innocence "stands as one of the most fundamental principles of our system of criminal justice:

11  defendants are considered innocent unless and until the prosecution proves their guilt beyond a

12  reasonable doubt.*"  American Civil Liberties Union v. U.S. Dept. of Justice*, ___ F.3d ___, 2014 WL

13  1851933, at *4 (D.C.Cir.2014); *see also Coffin v. United States*, 156 U.S. 432, 453 (1895) ("The

14  principle that there is a presumption of innocence in favor of the accused is the undoubted law,

15  axiomatic and elementary, and its enforcement lies at the foundation of the administration of our

16  criminal law.").  However, this court notes that the gist of the prosecutor's comments was that the

17  prosecution had overcome the presumption of innocence by proof of Browning's guilt beyond a

18  reasonable doubt -- a legitimate argument.  In other words, it is plain that the prosecutor's point was

19  not that the presumption of innocence is an unimportant idea to be ignored by the jury; it was that

20  the presumption of innocence had been overcome by evidence of Browning's guilt.  With this in

21  mind, and considering the weight of the evidence against Browning, this court finds that the Nevada

22  Supreme Court's conclusion -- that "[e]ven this outrageous but unpreserved act of misconduct,

23  however, does not prejudice Browning to the extent justifying reversal" -- was not objectively

24  unreasonable.

25          In Claim 6, at paragraphs 5.68 through 5.68.2, Browning argues that his trial counsel was

26  ineffective for not objecting to the prosecutor's comments regarding the presumption of innocence,

and for not requesting a curative jury instruction with respect to those comments.  Fifth Amended

Petition, pp. 57-58.  Browning made this claim on the appeal in his state habeas action.  *See*

Appellant's Opening Brief, Exhibit 232, p. 55 (ECF No. 59-175, p. 8).  The Nevada Supreme Court

ruled as follows:

> Browning complains that his counsel failed to object to the prosecutor's
> disparagement of the presumption of innocence.  On direct appeal this court
> "denounce[d] the state's reference to the 'presumption of innocence' as a farce," but
> concluded that this act did not justify reversal.  [Footnote: *Browning*, 104 Nev. at
> 272 n.1, 757 P.2d at 353 n.1.]  We conclude that Browning was not prejudiced by
> counsel's failure to object.

*Browning,* 120 Nev. at 358, 91 P.3d at 48.  Affording the Nevada Supreme Court's ruling the

deference required under 28 U.S.C. § 2254(d), this court does not find objectively unreasonable the

ruling that there is no reasonable probability that, but for counsel's failure to object to the

prosecution's comments about the presumption of innocence, or his failure to request a curative jury

instruction, the result of the trial would have been different.

<u>The Prosecutor's Comments Regarding the Reasonable Doubt Standard</u>

In his rebuttal closing argument, the prosecutor made the following comments regarding the

reasonable doubt standard:

> That makes me think of something.  There is not a criminal trial in which all
> the questions will be answered.  Not one of you will walk out of here knowing the
> answer to everything.  It never happens.  It is an impossibility.  You can't think of a
> situation in your life that's had any even minor degree or complications which you
> have resolved all of the questions.  You just can't do it.

> So, don't anticipate answering all the question in this case as a prerequisite to
> coming back with a guilty verdict.  It has nothing to do whatsoever with reasonable
> doubt.

Trial Transcript, Exhibit 51, p. 651 (ECF No. 59-47, p. 8).

In Claim 5, at paragraph 5.60, Browning claims:

> This argument was improper because discussing the reasonable doubt standard in the
> context of everyday decision making minimizes the importance of the reasonable
> doubt standard and of the jury's role in determining whether the State has met its
> burden.

Fifth Amended Petition, p. 53.  Browning made this claim on the appeal in his state habeas action,

albeit in a part of his brief dealing with alleged ineffective assistance of appellate counsel.  *See*

Appellant's Opening Brief, Exhibit 232, p. 62 (ECF No. 59-175, p. 15).  The Nevada Supreme

Court, however, found the claim to be procedurally barred.  *Browning,* 120 Nev. at 368, 91 P.3d at

54.

Browning argues that this claim is not barred by the doctrine of procedural default, asserting

that the claim was denied on its merits by the Nevada Supreme Court.  *See* Reply, p. 100.  However,

in the part of the Nevada Supreme Court's decision on which Browning relies for this argument, the

Nevada Supreme Court ruled on Browning's claim of ineffective assistance of appellate counsel, not

on the claim of prosecutorial misconduct.  *See Browning,* 120 Nev. at 365-66, 91 P.3d at 52.

Alternatively, Browning asserts ineffective assistance of his appellate counsel, for not raising

the claim on direct appeal, as cause for his procedural default.  *See* Reply, p. 100 n.39.  However,

even if Browning could show cause for this procedural default, there is no showing of prejudice.

Appellate counsel's failure to raise this claim on Browning's direct appeal was of no moment, as the

argument was acceptable.  *See Browning,* 120 Nev. at 365-66, 91 P.3d at 52.  This claim is barred by

the procedural default doctrine.  Furthermore, the court finds that there is no showing of any

possibility that the constitutional violation alleged in this claim "resulted in the conviction of one

who is actually innocent" (*see Murray*, 477 U.S. at 496), and the court determines that an

evidentiary hearing is not warranted with respect to the procedural default of this claim.  *See*

Petitioner's Motion for Evidentiary Hearing (ECF No. 135).

The Jury Instruction Regarding Reasonable Doubt

At Browning's trial, the court gave the following jury instruction:

The defendant is presumed to be innocent until the contrary is proved.  This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the defendant is the person who committed the offense.

A reasonable doubt is one based on reason.  It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life.  If the minds of the jurors, after the entire comparison and consideration of all

1    the evidence, are in such a condition that they can say they feel an abiding conviction
     of the truth of the charge, there is not a reasonable doubt.  Doubt to be reasonable
2    must be actual and substantial, not mere possibility or speculation.

3           If you have a reasonable doubt as to the guilt of the defendant, he is entitled to
     a verdict of not guilty.
4

5    Jury Instructions, Exhibit 52, Instruction No. 22 (ECF No. 59-48, p. 24).

6           In Claim 6, at paragraph 5.69 through 5.69.2, Browning claims that his trial counsel was

7    ineffective for failing to object to this jury instruction.  Fifth Amended Petition, pp. 59-60.

8    Browning made this claim on the appeal in his state habeas action.  *See* Appellant's Opening Brief,

9    Exhibit 232, p. 55 (ECF No. 59-175, p. 8).  The Nevada Supreme Court ruled as follows:

10          Browning also claims that counsel should have objected to the jury instruction
     on reasonable doubt as constitutionally inadequate.  He cites *Cage v. Louisiana*
11   [Footnote: 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990)] and *Bollinger v.
     State* [Footnote: 111 Nev. 1110, 1115, 901 P.2d 671, 674 (1995)] but ignores *Lord v.
12   State* [Footnote: 107 Nev. 28, 38-40, 806 P.2d 548, 554-56 (1991)], where this court
     determined that the Nevada reasonable doubt instruction at issue and the instruction
13   given in *Cage* were distinguishable and that the Nevada instruction was
     constitutional.  Thus, counsel was not ineffective.
14
     *Browning,* 120 Nev. at 359, 91 P.3d at 48.  This claim is meritless.  The reasonable doubt instruction
15
     given at Browning's trial was constitutional.  *Ramirez v. Hatcher*, 136 F.3d 1209, 1214-15 (9th
16
     Cir.1998) (upholding the same jury instruction as constitutional); *see also Nevius v. McDaniel*, 218
17
     F.3d 940, 944-45 (9th Cir.2000).  Counsel was not ineffective for failing to object to the jury
18
     instruction.  The Nevada Supreme Court's ruling on this claim was not objectively unreasonable.
19
            Cumulative Error - Guilt Phase of Trial
20
            In Claim 11, Browning claims that "[t]he cumulative effect of the errors demonstrated in [his
21
     fifth amended petition] deprived Mr. Browning of fundamentally fair proceedings and resulted in a
22
     constitutionally unreliable guilt determination."  Fifth Amended Petition, p. 104.
23
            The following are the claims resolved in this order, either primarily or in the alternative, on a
24
     finding that Browning was not prejudiced:
25
     -      the claims in Claim 1, at paragraphs 5.9 through 5.9.7, 5.12 through 5.12.4, and 5.16
26          through 5.16.4, that trial counsel was ineffective for failing to better investigate the
            credibility of the Wolfes, and better impeach the Wolfes' testimony;

53

-       the claim in Claim 1, at paragraphs 5.10 through 5.10.4, that trial counsel was ineffective for failing to interview Josy Elsen, or obtain a crime scene sketch of the jewelry store, to learn that, given the angle of her view and the layout of the store, she could not identify her husband's murderer;

-       the claims in Claim 1, at paragraphs 5.11 through 5.11.3, and 5.14.3 and 5.14.4, that trial counsel was ineffective for not sufficiently investigating the circumstances of Debra Coe's observations;

-       the claim in Claim 1, at paragraphs 5.13 through 5.13.4, that trial counsel was ineffective for not interviewing Officer Branon to learn that Branon received from Hugo Elsen the description of the murderer's hair, and that the description did not match Browning's hair;

-       the claim in Claim 1, at paragraphs 5.16 through 5.16.4, that trial counsel was ineffective for failing to secure the presence of Thomas Stamps to testify at trial for the defense;

-       the claim in Claim 1, at paragraph 5.19, that trial counsel was ineffective for not investigating the facts regarding Browning's escape;

-       the claim in Claim 4, at paragraphs 5.46 through 5.49, under *Brady v. Maryland*, 373 U.S. 83 (1963), that the prosecution withheld from the defense information related to the credibility of Randall Wolfe;

-       the claim in Claim 5, at paragraph 5.59, that the prosecutor made improper comments regarding the presumption of innocence;

-       the claim in Claim 5, at paragraph 5.61, that the prosecutor made improper arguments referring to the Ray Bradbury novel "Something Wicked This Way Comes," referring to the "Friday the 13th" horror movies, asserting that Browning was a heroin addict who liked killing, and stating that Browning "shot the life of Hugo Elsen right up his arm;"

-       the claim in Claim 5, at paragraph 5.64, that the prosecutor made improper arguments asking the jurors to put themselves in the shoes of the victim;

-       the claim in Claim 6, at paragraphs 5.68 through 5.68.2, that trial counsel was ineffective for failing to object, or request a curative jury instruction, with respect to the prosecutor's comments regarding the presumption of innocence;

-       the claim in Claim 6, at paragraphs 5.72 through 5.72.3, that trial counsel was ineffective for failing to object, or request a curative jury instruction, with respect to statements in the prosecutor's rebuttal closing argument regarding the defense's failure to put Marsha Gaylord on the stand to testify;

-       the claim in Claim 6, at paragraphs 5.73 through 5.73.7, that trial counsel was ineffective for failing to move to exclude the testimony of Josy Elsen identifying Browning as the murderer of her husband;

-       the claim in Claim 6, at paragraphs 5.75 through 5.76.6, that trial counsel was ineffective for not adequately cross-examining Debra Coe;

-  the claim in Claim 6, at paragraphs 5.77 through 5.77.3, that trial counsel was ineffective in that he "allowed the prosecution to present a photograph of Mr. Browning wearing the jacket that Mr. Pike had Mr. Browning try on before the jury to demonstrate that it did not belong to him;"

-  the claim in Claim 6, at paragraph 5.79, that trial counsel was ineffective for not objecting to the argument of the prosecutor regarding a photograph of Browning that allowed the jury to infer that Browning had been involved in prior criminal activity, and for not seeking a curative jury instruction;

-  the claim in Ground 6, at paragraph 5.80, that trial counsel was ineffective for failing to object, or request a curative jury instruction, with regard to the prosecutor's arguments to the effect that it was the jury's duty to convict Browning; and

-  the claim in Claim 6, at paragraph 5.83, that trial counsel was ineffective for failing to object to comments made by the prosecutor that Gaylord was a prostitute, that Browning needed money to get her out of jail so she could make money, and that this was a motive for the robbery and murder of Hugo Elsen.

The court has considered these claims cumulatively. For the most part, the court finds that the errors shown, or assumed for purposes of analysis, are de minimis, and plainly without any effect on the outcome of Browning's trial. And, the court finds that these alleged errors, whether actual or assumed, when taken cumulatively, did not cause the sort of prejudice to Browning necessary to warrant habeas corpus relief.

### Claim 10 - The Penalty Phase Retrial

In Claim 10 of his fifth amended petition, Browning claims that his constitutional rights were violated, at his resentencing, because "the prosecution, with the blessing of Judge Pavlikowski, knowingly introduced concededly false evidence to the second penalty jury, and the trial court prohibited the defense from challenging these falsehoods in any way." Fifth Amended Petition, p. 91; *see also id*. at 91-103. Specifically, Browning claims that, at the resentencing, the prosecution offered, and the court admitted, false evidence regarding the bloody shoe prints at the scene of the murder (*id*. at ¶¶5.112-5.113.2), the tan jacket (*id*. at ¶5.114), benefits received by Randall Wolfe in exchange for his testimony (*id*. at ¶¶5.115-5.117), benefits received by Vanessa Wolfe in exchange for her testimony (*id*. at ¶¶5.118-5.119), Josy Elsen's identification of Browning (*id*. at ¶¶5.120-5.121), Hugo Elsen's dying declaration regarding the appearance of the murderer (*id*.

at ¶¶5.122-5.123), Browning's fingerprints on glass at the scene of the murder (*id*. at ¶5.124), and a Casio watch found at the Wolfes' apartment (*id*. at ¶¶5.125-5.126).

Browning presented this claim to the Nevada Supreme Court on the appeal from the resentencing. *See* Appellant's Opening Brief, Exhibit 378, pp. 14-40 (ECF No. 119-1, pp. 25-51). With respect to this claim, the Nevada Supreme Court denied the claim, ruling as follows:

> Browning argues that the district court erred in precluding him from presenting evidence developed during post-conviction proceedings indicating that a host of evidence adduced at the original trial was false or misleading.

> *Evidence related to Randall and Vanessa Wolfe*

> \*   \*   \*

> Browning ... complains that Randall testified untruthfully at the first trial that he had not received any benefit from the State in exchange for his testimony. Browning directs our attention to the prosecutor's testimony at the post-conviction evidentiary hearing that at the time of Browning's trial, Randall was a defendant in a separate criminal prosecution and that after Browning's trial the prosecutor informed the judge assigned to Randall's prosecution that Randall had assisted in Browning's prosecution.  [Footnote: The prosecutor testified that Randall was never charged with theft, receiving stolen property, or perjury stemming from his retention of several pieces of jewelry stolen from Elsen's store. However, nothing in the record on appeal suggests that the State's failure to prosecute Randall in this regard was the result of any deal to secure his testimony at Browning's original trial.]  The prosecutor further stated that after Browning's trial, he assisted Randall in securing a job.  The prosecutor testified that he promised no benefits to Randall or Vanessa Wolfe before they testified at Browning's original trial.  We concluded in Browning's appeal from the post-conviction habeas proceedings that this information should have been disclosed to the defense pursuant to *Brady v. Maryland* but that there was not a reasonable probability that the result of Browning's trial would have been different. We conclude that any assistance the prosecutor provided to Randall, which the evidence shows occurred after Browning's original trial, was not of such import that its absence from the jury's consideration rendered Browning's penalty hearing unfair. Therefore, we conclude that relief is not warranted in this regard.

> Browning also argues that the district court erred by not allowing him to introduce evidence in the second penalty hearing that Vanessa had received benefits for her testimony.  However, nothing in Browning's submissions to this court adequately substantiates this claim.

> \*   \*   \*

> Browning next argues that a police detective's testimony during the second penalty hearing that the only aid he provided the Wolfes was assistance in entering a rehabilitation  program was misleading in light of overwhelming evidence showing that the Wolfes received extensive benefits for their testimony.  Vanessa corroborated the detective's testimony to the extent that she acknowledged that although the

detective assisted her and Randall in enrolling in a rehabilitation program, she received no assistance in paying for the program.  We conclude, however, that this assistance was not so significant that had it been presented to the jury, the result of the penalty hearing would have been different.

Even assuming that the district court erred in refusing to allow Browning to introduce the evidence explained above, we conclude that he has not demonstrated prejudice.  To the extent Browning argues that the evidence outlined above suggested that he was not the individual who stabbed Elsen, relief is not warranted because he had already been found guilty and such evidence was not relevant to the sentencing decision.

The focus of a capital penalty hearing is not the defendant's guilt, but rather his character, record, and the circumstances of the offense.  [Footnote: *McKenna v. State*, 114 Nev. 1044, 1052, 968 P.2d 739, 744 (1998); *Jones v. State*, 101 Nev. 573, 578, 707 P.2d 1128, 1132 (1985).]  Such considerations are relevant to the jury charged with imposing a penalty for a capital crime.  [Footnote: *Jones*, 101 Nev. at 578, 707 P.2d at 1132.]  This principle was affirmed in *Oregon v. Guzek*  [Footnote: 546 U.S. 517, 523, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006)].  In *Guzek*, the United States Supreme Court held that a capital murder defendant had no constitutional right to present additional alibi evidence at resentencing that was inconsistent with his prior conviction and shed no light on the manner in which he committed the crime for which he was convicted.  [Footnote: *Id*. at 523, 126 S.Ct. 1226.]  Although we have not yet addressed *Guzek*, in *Homick v. State*, we held that "there is no constitutional mandate for a jury instruction in a capital case making residual doubt a mitigating circumstance."  [Footnote: 108 Nev. 127, 141, 825 P.2d 600, 609 (1992); *see Franklin v. Lynaugh*, 487 U.S. 164, 174, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (reasoning that lingering doubts over a defendant's guilt do not constitute an aspect of the defendant's character, record, or a circumstance of the offense); *Middleton v. State*, 114 Nev. 1089, 1114, 968 P.2d 296, 313 (1998) (stating that "a capital defendant has no constitutional right to a jury instruction making residual doubt a mitigating circumstance").]  More recently, in *McKenna v. State*, we rejected an argument that the defendant was entitled to a residual doubt instruction at his second penalty hearing because the second jury had not determined his guilt.  [Footnote: 114 Nev. at 1059, 968 P.2d at 749.]  We reasoned that although "the penalty phase jury was composed of entirely different jurors than the guilt phase jury, a lingering doubt over [the defendant's] guilt is still not an aspect of his character, record, or a circumstance of the offense."  [Footnote: *Id*.]

Although *Homick* and *McKenna* concern residual doubt instructions, they are instructive respecting Browning's apparent desire to challenge his guilt at the second penalty hearing.  *Homick* and *McKenna* echo the general tenet that the focus of a penalty hearing is the defendant's character and record and the circumstances of the offense, not the defendant's guilt or innocence, as that matter has been decided.  We conclude that *Guzek* applies in this instance and precluded Browning from presenting evidence contradictory to the trial jury's finding that he stabbed Elsen.  Accordingly, to the extent that Browning argues that the evidence described above cast doubt on his guilt, we conclude that it was irrelevant in the penalty hearing.

To the extent Browning argues that the evidence outlined above was relevant mitigating evidence, we conclude that he has not demonstrated prejudice even if the district court erred in this regard.  The Wolfes' credibility was extensively challenged

1   at trial.  Throughout the second penalty hearing, Browning suggested that the Wolfes
    were involved in the crimes, as evidenced by the fact that Randall had pocketed
2   several pieces of jewelry stolen from Elsen's store.  Browning further argued that it
    was grossly unfair that the Wolfes had not been charged with any offense stemming
3   from Elsen's murder.  Additionally, the Wolfes' drug abuse and prior criminal
    activities were explored at the original trial, and the jury at the second penalty
4   hearing was privy to this information.  We conclude that the evidence Browning now
    contends should have been presented at the second penalty hearing is not of such
5   significance that it rendered his penalty hearing unfair.

6       *Other evidence alleged to have been false and misleading*

7           Browning argues that the district court erred in allowing the State to introduce
    false and misleading evidence concerning: (1) Elsen's description of the individual
8   who stabbed him, (2) Josy Elsen's identification of Browning as the person who
    stabbed her husband, (3) bloodstains found on a tan leather jacket belonging to
9   Browning, (4) Browning's fingerprints found at the crime scene, (5) the recovery of a
    watch found in the motel room where Browning was arrested, and (6) bloody
10  shoeprints found at the crime scene.  Browning argues that he suffered prejudice from
    the State's repeated use of this allegedly false and misleading evidence because it was
11  relevant to the aggravating circumstances alleged by the State and the mitigating
    evidence he intended to present.  However, Browning fails to adequately explain its
12  relevance to his case in mitigation.  Rather, Browning appears to argue that if he had
    been allowed to challenge the reliability of this evidence during the second penalty
13  hearing, it would have cast doubt on his conviction.  However, as explained above,
    pursuant to *Guzek*, Browning was not entitled to challenge his conviction in this
14  manner in the second penalty hearing.

15  *Browning v. Nevada*, 124 Nev. 517, 526-28, 188 P.3d 60 (2008) (select footnotes omitted).

16      With respect to the Nevada Supreme Court's application of federal law in denying his claim,

17  Browning attempts in his reply to distinguish *Guzek*.  *See* Reply, p. 169.  Browning argues:

18          The Nevada Supreme Court's reliance on *Guzek* is misplaced and erroneous.
    In *Guzek*, the issue was whether Guzek should be allowed to introduce new alibi
19  evidence at his subsequent sentencing trial which proved that he did not commit the
    murder in issue.  Because the new evidence did not shed light on the manner in which
20  the crime was committed and because Guzek could not show the evidence was
    unavailable to him at the time of the original trial, the United States Supreme Court
21  rejected Guzek's argument.  546 U.S. at 523-524.

22          The *Guzek* decision was not faced with the issue at hand, namely the
    presentation of evidence that was demonstrated to be false and misleading during the
23  post-conviction proceeding.  As such, the *Guzek*, opinion should not be construed to
    permit false and misleading evidence or to overrule other authority.  *See, e.g.*, *Napue*
24  *v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373 U.S. 83 (1963); *Strickland v.*
    *Washington*, 466 U.S. 668 (1984); *Townsend v. Burke*, 344 U.S. 736 (1948).

25

26  *Id*.

58

1      This court disagrees that the Nevada Supreme Court's reliance on *Guzek* was "misplaced and

2   erroneous."  Rather, this court finds that case to be apt guidance from the United States Supreme

3   Court.  As in this case, in *Guzek*, Guzek sought to present evidence at the resentencing to undermine

4   the determination of his guilt, and the Supreme Court ruled that federal law did not extend to Guzek

5   any right to do so.  In its thorough analysis, the Nevada Supreme Court reasonably ruled that, under

6   *Guzek*, Browning was not entitled to attempt to prove that evidence underpinning his conviction was

7   false or misleading.  The Nevada Supreme Court's ruling, in that respect, was not contrary to, or an

8   unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

9   the United States.  *See* 28 U.S.C. § 2254(d).

10     Browning does not make any showing that the Nevada Supreme Court's resolution of this

11  claim was contrary to, or a misapplication of, Supreme Court precedent.  This court does not find

12  *Napue v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373 U.S. 83 (1963); *Strickland v.*

13  *Washington*, 466 U.S. 668 (1984); or *Townsend v. Burke*, 344 U.S. 736 (1948) -- none of which

14  involved an attempted attack on evidence underpinning a determination of guilt in a resentencing --

15  to have been misapplied by the Nevada Supreme Court.

16     With respect to the other part of the Nevada Supreme Court's ruling -- that, to the minor

17  extent any of the evidence proffered by Browning would have had any bearing on aggravation or

18  mitigation, the effect of the evidence on the issues of aggravation and mitigation would have been

19  slight, and Browning was not prejudiced -- was not objectively unreasonable.

20     The court, therefore, denies Browning habeas corpus relief with respect to Claim 10.

21  Certificate of Appealability

22     This is a final order adverse to Browning.  Therefore, Rule 11(a) of the Rules Governing

23  Section 2254 Cases in the United States District Courts mandates that this court must issue or deny a

24  certificate of appealability.  *See* 28 U.S.C. § 2253(c); Rule 11(a), Rules Governing Section 2254

25  Cases in the United States District Courts; Fed. R. App. P. 22(b).

26

1    The standard for the issuance of a certificate of appealability requires a "substantial showing

2    of the denial of a constitutional right."  28 U.S.C. §2253(c).  The Supreme Court interpreted

3    28 U.S.C. §2253(c) as follows:

4         Where a district court has rejected the constitutional claims on the merits, the
         showing required to satisfy § 2253(c) is straightforward: The petitioner must
5         demonstrate that reasonable jurists would find the district court's assessment of the
         constitutional claims debatable or wrong. The issue becomes somewhat more
6         complicated where, as here, the district court dismisses the petition based on
         procedural grounds. We hold as follows: When the district court denies a habeas
7         petition on procedural grounds without reaching the prisoner's underlying
         constitutional claim, a COA should issue when the prisoner shows, at least, that
8         jurists of reason would find it debatable whether the petition states a valid claim of
         the denial of a constitutional right and that jurists of reason would find it debatable
9         whether the district court was correct in its procedural ruling.

10   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79

11   (9th Cir.2000).

12   The court finds that, applying these standards, a certificate of appealability is warranted with

13   respect to the following of Browning's claims in his fifth amended habeas petition:

14   -    the claim in Claim 1, at paragraphs 5.7 to 5.7.3, that trial counsel was ineffective for
         conducting an insufficient investigation regarding the bloody shoe prints;
15

16   -    the claims in Claim 1, at paragraphs 5.9 through 5.9.7, 5.12 through 5.12.4, and 5.16
         through 5.16.4, that trial counsel was ineffective for failing to better investigate the
         credibility of the Wolfes, and better impeach the Wolfes' testimony;
17

18   -    the claim in Claim 1, at paragraphs 5.13 through 5.13.4, that trial counsel was
         ineffective for not interviewing Officer Branon to learn that Branon received from
         Hugo Elsen the description of the murderer's hair, and that the description did not
19       match Browning's hair;

20   -    the claims in Claim 4, at paragraphs 5.43 to 5.43.3, under *Brady* and *Napue*, that the
         prosecution withheld exculpatory information, and presented testimony that was
21       misleading or false, when it presented the trial testimony of David Horn, whose
         testimony suggested, in essence, that the bloody shoe prints were likely left by
22       paramedics or off duty detectives; and

23   -    the claim in Claim 4, at paragraphs 5.46 through 5.49, under *Brady*, that the
         prosecution withheld from the defense information related to the credibility of
24       Randall Wolfe.

25   The court declines to issue a certificate of appealability with respect to Browning's other claims.

26

1    **IT IS THEREFORE ORDERED** that the motions in petitioner's "Ex Parte Motion for

2   Court to Take Judicial Notice of Sworn Facts and Requests for Relief in Petitioner's October 9, 2013

3   Letter (Dkt. #174); Request for Court to Address the Conflict of Interest Issue Involving the

4   Unauthorized Abandonment of Eighteen Fully Exhausted Substantial Constitutional Claims at Dkt.

5   #174, Pgs. 5-13" (ECF Nos. 175, 176) are **DENIED**.

6    **IT IS FURTHER ORDERED** that petitioner's fifth amended petition for writ of habeas

7   corpus (ECF No. 115) is **DENIED**.

8    **IT IS FURTHER ORDERED** that petitioner is granted a certificate of appealability with

9   respect to the following claims in his fifth amended petition for writ of habeas corpus:

10   -    the claim in Claim 1, at paragraphs 5.7 to 5.7.3, that trial counsel was ineffective for
         conducting an insufficient investigation regarding the bloody shoe prints;

11

12   -    the claims in Claim 1, at paragraphs 5.9 through 5.9.7, 5.12 through 5.12.4, and 5.16
         through 5.16.4, that trial counsel was ineffective for failing to better investigate the
         credibility of the Wolfes, and better impeach the Wolfes' testimony;

13

14   -    the claim in Claim 1, at paragraphs 5.13 through 5.13.4, that trial counsel was
         ineffective for not interviewing Officer Branon to learn that Branon received from
         Hugo Elsen the description of the murderer's hair, and that the description did not

15       match Browning's hair;

16   -    the claims in Claim 4, at paragraphs 5.43 to 5.43.3, under *Brady* and *Napue*, that the
         prosecution withheld exculpatory information, and presented testimony that was

17       misleading or false, when it presented the trial testimony of David Horn, whose
         testimony suggested, in essence, that the bloody shoe prints were likely left by

18       paramedics or off duty detectives; and

19   -    the claim in Claim 4, at paragraphs 5.46 through 5.49, under *Brady*, that the
         prosecution withheld from the defense information related to the credibility of

20       Randall Wolfe.

21

22    **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

23
         Dated this 1st day of August, 2014.
24

25   _____

26   UNITED STATES DISTRICT JUDGE